FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 0 5 2004 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

LINDA VELEZ,

    Plaintiff,

    - against -

BETSY SANCHEZ,

    Defendant.

Index No.

**CV 04 4797**

**BLOCK, J.**

COMPLAINT

JURY TRIAL
DEMANDED

-------------------------------------------------------------------x

POLLAK, M.J.

Linda Velez, by and for her Complaint in the above-captioned matter, alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff, Linda Velez, brings this action to obtain unpaid wages, overtime premiums, and damages from the Defendant for violations of federal, New York State, and international law. Ms. Velez was brought to this country under false pretenses and was required to work without pay subject to threats made by the Defendant and, as a result, is owed damages in an amount not less than $500,000.00.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). This Court has supplemental jurisdiction over Ms. Velez's state law claims pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over Ms. Velez's international law claims pursuant to 28 U.S.C. §§ 1331, 1350 and 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events that give rise to this action occurred within this district and the Defendant resides within this district.

1

## PARTIES

4.  Plaintiff, Linda Velez, is a citizen of Ecuador who resides in the State of New York.

5.  Upon information and belief, the Defendant, Betsy Sanchez, resides at 56-09 184 Street, Fresh Meadows, NY 11365.

## STATEMENT OF FACTS

6.  Linda Velez was born on March 23, 1985, in Ecuador.

7.  In August 2001, Ms. Velez was sixteen years old and attending high school in Ecuador. She lived with her mother and stepfather. Linda's stepfather has two daughters from a prior relationship: Defendant Betsy Sanchez, who, upon information and belief was thirty-one years old at the time Ms. Velez came to the United States, and Shari Munoz, who, upon information and belief was twenty-eight years old at the time Ms. Velez came to the United States.

Promises Made by the Defendant to Entice Ms. Velez to Come to New York

8.  In August 2001, the Defendant asked Ms. Velez's stepfather if Ms. Velez would like to move to New York to live with her, to finish her studies in the United States and to care for the Defendant's newborn baby, Nicole.

9.  The Defendant promised Ms. Velez's stepfather that she would pay Ms. Velez $80.00 per week to care for her newborn baby.

10. The Defendant promised that Ms. Velez would only have to care for her baby Monday thru Friday, during the hours that the Defendant was at work.

11. The Defendant promised that Ms. Velez would be able to finish high school in the evenings and have a normal, teenage life in the United States. Defendant stated, Ms. Velez would also be able to attend college in the United States.

2

12. The Defendant promised Ms. Velez that she would pay for her college tuition and would even take out a loan from the bank so that Ms. Velez could go to college in the United States.

13. During several additional phone conversations with Ms. Velez's stepfather, the Defendant repeatedly promised him that if Ms. Velez left Ecuador and moved to New York:

    a. Ms. Velez would finish high school in the United States so that she could then attend college in the United States,

    b. Ms. Velez would only have to care for the Defendant's newborn baby during the limited hours the Defendant was at work, and

    c. Ms. Velez would be paid $80.00 per week for this work.

14. On several occasions, the Defendant also made these promises directly to Ms. Velez over the phone when she called to further encourage Ms. Velez to move to New York.

15. During one of these calls, the Defendant told Ms. Velez that she had been shopping for a new bed for Ms. Velez and that if she chose to move to New York, she would also have her own bedroom.

16. Because Ms. Velez wanted to pursue her education in the United States, she accepted Defendant's offer.

17. Ms. Velez gave up her life in Ecuador by leaving her family, her friends, and her high school behind.

18. Ms. Velez made it clear to the Defendant that she wanted to come to the United States to pursue her education. She agreed to care for the Defendant's newborn baby when the

3

Defendant was at work under the condition that she be paid for the work and that she would be able to attend high school in New York.

19. Moreover, Ms. Velez decided to accept this arrangement based on her good relationship with the Defendant, which developed over the Defendant's annual visits to Ecuador. Ms. Velez believed the Defendant would keep her promises.

20. Ms. Velez believed and trusted that the Defendant would take care of her in New York as she had promised Ms. Velez and her stepfather on numerous occasions.

21. At the time Ms. Velez left Ecuador, she was a successful student at a well-regarded private school. Ms. Velez left half way through her tenth grade year, with one and one-half years left to graduate.

22. Ms. Velez's ultimate goal in coming to America was to finish high school and to attend college in the United States.

Arrival in New York

23. The Defendant invited Ms. Velez to come to the United States and purchased Ms. Velez's airplane ticket for her.

24. On or about September 22, 2001, Ms. Velez arrived at New York in John F. Kennedy Airport, as the Defendant had arranged.

25. Upon arrival, the Defendant deceived Ms. Velez into giving the Defendant her passport, claiming the Defendant would keep the passport so Ms. Velez would not lose it. Subsequently, the Defendant refused to return Ms. Velez's passport to her.

26. At the Defendant's apartment in Fresh Meadow, Queens, Ms. Velez did not have her own room and was required to sleep on the sofa in the living room for almost a year. Thereafter, the Defendant placed a small cot bed in her daughter, Nicole's room for Ms.

4

Velez. When the Defendant's second baby, Erica, was born, in order to make room for the three of them, the Defendant purchased a bunk bed that Ms. Velez was required to share with Nicole. This enabled Ms. Velez to continue her care of the Defendant's children during the night.

Breach of Agreement

27. The Defendant failed to abide by her agreement with Ms. Velez. The working conditions were not as the Defendant had promised. The Defendant demanded far more work from Ms. Velez than they agreed to when Ms. Velez was in Ecuador. Ms. Velez did not merely care for the Defendant's children, but was also a domestic worker.

28. Upon Ms. Velez's arrival in New York, the Defendant spent two months at home with Ms. Velez training her to care for the Defendant's newborn baby, Nicole.

29. During these two months, Ms. Velez worked on average from 8:00 a.m. to 10:00 p.m. Monday thru Friday and from 10:00 a.m. to 10:00 p.m. Saturdays and Sundays, despite the Defendant's earlier promise that Ms. Velez would only have to work for limited hours Monday thru Friday.

30. The Defendant did not pay Ms. Velez for her work during these first two months when the Defendant was on maternity leave. The Defendant told Ms. Velez that she did not have the money to pay Ms. Velez at that time. The Defendant promised to pay Ms. Velez as soon as she went back to work.

31. After two months, the Defendant left Ms. Velez in the home to care for Nicole in the Defendant's home full time. Ms. Velez became Nicole's primary caretaker.

32. As Nicole's primary caretaker, Ms. Velez's childcare responsibilities included, but were not limited to, feeding her all meals, changing her diapers, bathing her, playing with her,

5

keeping a close eye on her throughout the day and night, and tending to her in the middle of the night should she awake.

33. In addition to requiring Ms. Velez to care for the newborn baby, the Defendant also required Ms. Velez to serve as a domestic worker and perform nearly all of the household's chores.

34. The amount of household chores the Defendant demanded of Ms. Velez increased with time.

35. Ms. Velez's daily household responsibilities included, but were not limited to, preparing all meals for the family, washing the dishes, sweeping and mopping the floors, dusting the furniture in the house, making the beds, cleaning the bathrooms (including scrubbing the toilets), cleaning the kitchen, washing the family's laundry at home and then taking the wet laundry to the local laundromat to dry.

36. The Defendant continued to require Ms. Velez to work more than 12 hours per day; if Ms. Velez failed to do so, the Defendant would get very angry and punish her by yelling, insulting, and sometimes not speaking to her.

37. After the Defendant returned to work in November 2001, Ms. Velez worked approximately 17 hours a day, from Monday through Friday from 6:00 a.m. to 11:00 p.m. and was on-call 24 hours a day. If Nicole woke up in the middle of the night, Ms. Velez was required to care for her and stay with her until she fell asleep again. This occurred on average one to two times a night. During this period, Ms. Velez worked from approximately 8:00 a.m. to 10 p.m. on Saturdays and Sundays.

38. The Defendant did not pay Ms. Velez for her work, even after the Defendant returned to work. When Ms. Velez would ask about being paid, the Defendant variously would

6

promise to pay Ms. Velez at a later date, would promise to pay Ms. Velez' college

education, would become verbally abusive towards Ms. Velez, and would threaten to

have Ms. Velez returned to Ecuador.

39. Because the Defendant never paid Ms. Velez for her work, Ms. Velez was required to get

a part-time job outside of the home in order to pay for her expenses.

40. Starting in June 2002, Ms. Velez attended English-language classes when her work

schedule permitted. Ms. Velez paid for these classes with the money she earned working

outside of the Defendant's home on the weekends. The Defendant required Ms. Velez to

care for Nicole from 6:00 a.m. to 11:00 p.m. Monday thru Friday and when Ms. Velez

arrived at home on the weekends around 7:00 p.m. or 8:00 p.m.

41. This schedule continued until October 2002, when the Defendant gave birth to her second

baby, Erica, and required Ms. Velez to quit her job and the English-language classes she

was taking in order to resume working for the Defendant seven days a week. Ms. Velez

was required to care for the Defendant's two children as well as do all of the housework

from 6:00 a.m. to 11:00 p.m. Monday thru Friday and from 8:00 a.m. to 10:00 p.m. on

Saturday and Sunday.

42. Ms. Velez wanted to resume her job outside the Defendant's home, but was not allowed

to do so. The Defendant told Ms. Velez that if she took another job outside of the home

then she would have to give a portion of that income to the Defendant.

43. Ms. Velez was still required to tend the children if they woke in the night. After Erica

was born this occurred on average two to three times a night.

44. For the first two years, the Defendant did not pay Ms. Velez any money for her work as

the children's primary caretaker and the family's domestic worker. When Ms. Velez

7

asked the Defendant about her salary, the Defendant would get mad. She would often respond that she did not have the money at that time, that Ms. Velez needed to wait a while longer, or she would become verbally abusive. On occasion, the Defendant would tell Ms. Velez not to worry because she promised to pay for Ms. Velez's college tuition.

45. As time passed, it became apparent that the Defendant had effectively denied Ms. Velez the opportunity to finish high school. Nevertheless, Ms. Velez was determined to get a high school degree and she therefore enrolled in a GED course in July 2003. The course began in September 2003 at La Guardia Community College and classes were to be held on Saturdays. The Defendant promised Ms. Velez she would pay the tuition for this course.

46. In or around September 2003, the Defendant promised to pay Ms. Velez variously $30.00 or $50.00 per week to cover her living and travel expenses, such as bus fare to get her to the GED course. The Defendant agreed to pay this money on the condition that Ms. Velez would not ask her for anything else. However, the Defendant failed to pay this money on a weekly basis as agreed.

47. At the end of August, when it was time to pay the tuition for the GED course, the Defendant reneged on her promise to pay the tuition and told Ms. Velez that she did not have the money. In order to preserve her seat in the course, Ms. Velez asked the Defendant if she would pay her two months advance living and travel money to be used for tuition. The Defendant gave Ms. Velez $200.00 as her two months advance to pay the tuition for the GED course. The $200.00 is the only money the Defendant gave Ms. Velez during the more than two years that Ms. Velez has worked for the Defendant.

8

The Defendant Prohibited Ms. Velez from Going to High School

48. Throughout this period, the Defendant prohibited Ms. Velez from attending and completing high school.

49. The Defendant deprived Ms. Velez of the opportunity to complete her high school education when she refused to permit Ms. Velez to attend school and refused to pay Ms. Velez her salary, so she was unable to pay for her own weekend classes.

50. During the school year that began in September 2001, Ms. Velez was sixteen years of age. Under New York State law, she was required to attend school, unless she withdrew from school and received specific certification allowing her to work full-time in lieu of attending school.

51. Ms. Velez never withdrew from school pursuant to the procedures required under New York law. Indeed, she actively sought to continue her high school education but was prohibited from enrolling in school by the Defendant, who required instead that Ms. Velez work up to 17 hours per day caring for Defendant's children and tending her home.

52. Even when school is not in session, New York State law prohibits children aged sixteen and seventeen from working more than 8 hours per day, not to exceed 48 hours per week or 6 days per week or after 12 midnight or before 6 a.m.

53. Moreover, children aged sixteen and seventeen may only work if they receive an employment certificate or permit pursuant to New York Education Law and New York Labor Law.

54. During Ms. Velez's first nine months at the Defendant's home, Ms. Velez asked the Defendant on numerous occasions about attending high school and the Defendant replied that she was looking into it.

55. Eventually, the Defendant told Ms. Velez that she could not attend high school because the only high school in the area with evening classes was for problem students and Ms. Velez was not eligible.

56. In July 2003, the Defendant promised Ms. Velez she would pay the tuition for the GED course that Ms. Velez had enrolled in at LaGuardia Community College.

57. When classes began in September, the Defendant still expected Ms. Velez to take care of Nicole and her second baby, Erica, during the week and when Ms. Velez returned to the Defendant's home at night on weekends.

The Confinement

58. The Defendant confiscated Ms. Velez's passport at the time she arrived and refused to return it.

59. Ms. Velez was not permitted to speak freely to anyone other than the Defendant, the Defendant's sister, and the Defendant's mother. In particular, Ms. Velez was prohibited from speaking freely with the Defendant's in-laws, who were sympathetic to her. Ms. Velez was not permitted to tell anyone that she was not being paid or that she was not enrolled in school.

60. Moreover, the Defendant prohibited Ms. Velez from freely choosing her daily activities, even during times when she was not required to work. The Defendant required Ms. Velez to obtain permission from her before Ms. Velez could visit friends, get another job, attend classes or do any other personal activity.

61. The Defendant was frequently verbally abusive to Ms. Velez. She also frequently threatened to send Ms. Velez back to Ecuador when she was angry at her for not heeding

10

the Defendant's demands. Ms. Velez feared the Defendant and was afraid to defy her orders because of the verbal abuse.

62. When Ms. Velez disobeyed the Defendant, the punishment was harsh. For example, on October 6, 2003, when Ms. Velez returned home 30 minutes later than she was permitted the Defendant locked Ms. Velez out of the house. Ms. Velez had no other place to go.

63. The Defendant's refusal to pay Ms. Velez left her with no resources of her own that would permit her to leave the Defendant's house.

64. The Defendant denied Ms. Velez the promised opportunity of completing her education, which thwarted Ms. Velez's ability to develop, and limited Ms. Velez's contact with the outside world.

65. As a minor, in another country, who did not speak the language, and had not completed high school, Ms. Velez was particularly susceptible to the Defendant's threats and control. Ms. Velez's will was overcome by the Defendant and she was unable to leave.

66. Beginning in or about October 2002, the Defendant arranged for her mother to come to the house while the Defendant was at work, to monitor Ms. Velez's actions, and to report back to Defendant.

67. Throughout the time Ms. Velez was living with the Defendant, the Defendant listened in on Ms. Velez's phone conversations with her family and friends in Ecuador.

68. The Defendant isolated Ms. Velez by not allowing her to meet and go out with friends and by requiring her to stay in the kitchen when they had company in the house.

69. The Defendant's in-laws were sympathetic to Ms. Velez and reached out to her. The Defendant went to great pains to keep Ms. Velez away from the Defendant's in-laws and instructed Ms. Velez to lie to them about her situation.

11

70. Ms. Velez was required to give the Defendant one week notice if she wanted to visit with friends.

71. The Defendant was a domineering and controlling person who often showed anger to Ms. Velez, verbally abused, and threatened to send Ms. Velez to Ecuador without receiving any pay.

72. Moreover, Ms. Velez feared the Defendant would become violent if she defied the Defendant's wishes. Therefore, Ms. Velez made every effort not to provoke the Defendant.

The Assaults

73. Ms. Velez's fears that the Defendant would become violent were realized on November 8, 2003 and November 11, 2003, when the Defendant did in fact lash out in violence.

74. The Defendant attempted to control Ms. Velez even when she was not working. On one occasion, on November 8, 2003, Ms. Velez went to visit a friend after obtaining permission from the Defendant. The Defendant was suspicious that Ms. Velez was actually receiving assistance from the Defendant's in-laws and not visiting with a friend. Consequently the Defendant tracked Ms. Velez down and sent her sister, Shari, to retrieve and threaten Ms. Velez.

75. Later that same evening, the Defendant physically forced Ms. Velez into Shari's car in an effort to keep Ms. Velez away from the Defendant's in-laws who came to the Defendant's home to advocate for Ms. Velez. The Defendant directed Shari to drive off with Ms. Velez.

76. Ms. Velez was afraid and begged Shari to take her back to the Defendant's home, where she hoped for an intervention by the Defendant's in-laws on her behalf. Ms. Velez was

afraid Shari was taking her back to Ecuador as threatened. Ms. Velez was also physically afraid of Shari, who she believed to have been a gang member when she was younger.

77.  When the car continued to drive away even after Ms. Velez demanded to be let out of the car, Ms. Velez was forced to jump from the moving vehicle. Shari drove off and left Ms. Velez behind. Ms. Velez's leg was injured from the jump and she was in pain as a result of this incident. Because Ms. Velez did not have anywhere else to go, she returned to the Defendant's house.

78.  On November 11, 2003, when Ms. Velez finally expressed her intent to leave the Defendant's home her fears about the Defendant's propensity to violence were realized. The Defendant became very angry and verbally abusive. The Defendant also threatened to send Ms. Velez back to Ecuador by force.

79.  Ms. Velez sought the assistance of the Defendant's husband, but the Defendant kept him out of the house. Ms. Velez also sought the assistance of the Defendant's in-laws, but they were also kept out of the house.

80.  On November 11, 2003, while Ms. Velez was packing her belongings in garbage bags to move out of the Defendant's home, the Defendant grabbed Ms. Velez, shook her and threw Ms. Velez to the ground. The Defendant then grabbed Ms. Velez's belongings from the bags and threw them all over the floor. The Defendant told Ms. Velez that she could not take anything from the house. Ms. Velez finally left without her belongings.

81.  Because of the commotion at the house, the police were called. When they arrived, the Defendant told the police that the Defendant was an illegal immigrant who should be taken into custody and returned to Ecuador. The police rejected the Defendant's request and Ms. Velez departed.

13

82. The next day, the Defendant went to the police station and made a report accusing Ms.
    Velez of stealing the Defendant's engagement ring and having a relationship with the
    Defendant's husband. The police did not find merit in the Defendant's accusations and
    took no further action.

83. Shortly after Ms. Velez left the Defendant's home, the Defendant stole Ms. Velez's purse
    that contained the ID card issued to her by the Ecuadorian consulate; the ID card for La
    Guardia Community College; other personal papers; and $80.00 in cash.

## FIRST CLAIM FOR RELIEF
### Involuntary Servitude
### U.S. Constitution and Federal Statute

84. Ms. Velez realleges and incorporates by reference each and every allegation contained in
    the preceding paragraphs as if set forth fully herein.

85. Ms. Velez brings this claim for relief under the private cause of action implied under the
    Thirteenth Amendment of the United States Constitution, and under 42 U.S.C. § 1994
    and 18 U.S.C. §§ 1581, 1584.

86. As alleged herein, the Defendant used threats of physical harm and mental, physical and
    legal coercion to induce Ms. Velez to work against her will, requiring her to work
    without pay.

87. Defendant's threats and coercion caused Ms. Velez to reasonably believe that she had no
    alternative but to continue her service for Defendant.

88. As a minor, Ms. Velez was particularly vulnerable to such threats and coercion.

14

89. The Defendant committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent of injuring Ms. Velez and in conscious disregard of Ms. Velez's rights.

90. Through such actions, the Defendant created and enforced a system of involuntary servitude prohibited by the Thirteenth Amendment of the United States Constitution, and 42 U.S.C. § 1994, and 18 U.S.C. §§ 1581, 1584.

91. As a direct and proximate result of these actions, Ms. Velez has sustained damages, including emotional distress, economic losses, and physical injury, entitling her to damages of no less than $200,000.00.

### SECOND CLAIM FOR RELIEF
### Alien Tort Claims Act
### Trafficking

92. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

93. Defendant, by inducing Ms. Velez to accept employment with her in the United States through fraud and deception for the purposes of subjecting her to a condition of involuntary servitude and forced labor, engaged in trafficking of Ms. Velez in violation of the law of nations.

94. Defendant's actions constitute torts in violation of the law of nations, and are actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

95. Numerous international instruments, customary international norms, domestic statutes and case law, and international case law establish human trafficking as violating the law of nations. Such authorities include: the Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A (III.), U.N. GAOR, 3rd Sess., U.N. Doc. A/ILO (1948); the

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171,

61 I.L.M. 368 (1967); the Slavery Convention of 1926, Sept. 25 1926, 46 Stat. 2183, 60

U.N.T.S. 253; the Supplementary Slavery Convention on the Abolition of Slavery, the

Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T.

3201, 266 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour, June

28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour,

June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All Forms of

Discrimination Against Women, December 18, 1979, 34 U.N. GAOR, 19 I.L.M. 33

(1980); and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons,

Especially Women and Children, Supplementing the United Nations Convention Against

Transnational Organized Crime, art. 3(a), G.A. res. 55/25, annex II, U.N. GAOR Supp.

(No. 49) at 69, U.N. Doc. A/45/49 (Vol. I) 2001). These prohibitions against trafficking

in persons are reflected in United States law in the Trafficking Victims Protection Act, 18

U.S.C. Sec. 1590, as well as other U.S. authorities.

96. As a direct and proximate result of these actions, Ms. Velez has sustained damages,

including physical injury, emotional distress, and economic losses, entitling her to

damages in an amount not less than $200,000.00.

### THIRD CLAIM FOR RELIEF
### Alien Tort Claims Act
### Involuntary Servitude, Forced Labor, and Enslavement

97. Ms. Velez realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

98.  The Defendant, by inducing Ms. Velez to work against her will through the use of threats
of serious harm and psychological, physical and legal coercion, subjected Ms. Velez to
conditions of forced labor, involuntary servitude, and enslavement.

99.  Through such actions, Defendant created and enforced a pattern of behavior intended to
cause Ms. Velez to believe that if she did not perform such labor or services, she would
suffer serious harm.

100. Defendant, by requiring Ms. Velez to work against her will through the use of threats of
serious harm and psychological, physical, and legal coercion, subjected Ms. Velez to
conditions of forced labor, involuntary servitude, and enslavement.

101. Defendant's actions constitute torts in violation of the law of nations, and are actionable
pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

102. Numerous international instruments, customary international norms, domestic statutes
and case law, and international case law establish modern manifestations of slavery such
as involuntary servitude, enslavement, and forced labor as violations of the law of
nations. Such authorities include: the Universal Declaration of Human Rights, Dec. 10,
1948, G.A. Res. 217A (III.), U.N. GAOR, 3rd Sess., art. 4, U.N. Doc. A/ILO (1948); the
International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 8, 999 U.N.T.S.
171, 61 I.L.,M 368 (1967); the Slavery Convention of 1926, Sept. 25 1926, 46 Stat. 2183,
60 U.N.T.S. 253; the Supplementary Slavery Convention on the Abolition of Slavery, the
Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T.
3201, 266 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour, June
28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour,
June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All Forms of

Discrimination Against Women, December 18, 1979, art. 6, 34 U.N. GAOR, 19 I.L.M.

33 (1980); and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons,

Especially Women and Children, Supplementing the United Nations Convention Against

Transnational Organized Crime, art. 3(a), G.A. res. 55/25, annex II, U.N. GAOR Supp.

(No. 49) at 69, U.N. Doc. A/45/49 (Vol. I) 2001). These prohibitions against modern

manifestations of slavery such as involuntary servitude, enslavement, and forced labor

are reflected in United States law in the Trafficking Victims Protection Act, 18 U.S.C.

Sec. 1589, as well as other U.S. authorities.

103. As a direct and proximate result of the actions described herein, Ms. Velez has sustained

damages, including physical injury, emotional distress, and economic losses, entitling her

to damages in an amount not less than $200,000.00.

### FOURTH CLAIM FOR RELIEF
### Federal Minimum Wage

104. Ms. Velez realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

105. The Defendant employed Ms. Velez within the meaning of the Fair Labor Standards Act,

29 U.S.C. §§ 203(d)-(e).

106. The Defendant willfully failed to pay Ms. Velez minimum wages, in violation of 29

U.S.C. § 206(a) and the United States Department of Labor regulations.

107. The Defendant's willful violation of the Fair Labor Standards Act entitles Ms. Velez to

recovery of her unpaid minimum wages which is not less than $62,000.00, an equal

amount as liquidated damages and reasonable attorneys' fees and costs of the action

pursuant to 29 U.S.C. §§ 201, *et seq.* and the United States Department of Labor

regulations, in addition to declaratory relief.

18

### FIFTH CLAIM FOR RELIEF
### New York State Minimum Wage and Overtime

108. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

109. The Defendant employed Ms. Velez within the meaning of the New York State Labor Law, N.Y. Labor Law §§ 2(5)-(7).

110. The Defendant's intentional and willful failure to pay Ms. Velez the minimum wages required by law violates New York State Labor Law §§ 190, *et seq.* and 650, *et seq.* and the New York State Department of Labor regulations, from commencement of employment as a domestic worker from in or about September 2001, until approximately November 2003.

111. The Defendant's willful failure to pay Ms. Velez overtime pay for work in excess of 44 hours per week violates New York State Labor law §§ 190, *et seq.* and 650, *et. seq.* and the New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

112. Ms. Velez is entitled to an award of damages for unpaid minimum wages and unpaid overtime in an amount of not less than $81,000.00, plus interest.

### SIXTH CLAIM FOR RELIEF
### New York State Liquidated Damages

113. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

114. The Defendant employed Ms. Velez within the meaning of New York State Labor Law, N.Y. Labor Law §§ 2(5)-(7).

19

115. The Defendant's willful failure to pay Ms. Velez the minimum wages required by law violates New York State Labor Law §§ 190, *et. seq.* and 650, *et. seq.* and the New York State Department of Labor regulations.

116. The Defendant's willful failure to pay Ms. Velez overtime pay for work in excess of 44 hours per week violates New York State Labor Law §§ 190, *et. seq.* and 650, *et. seq.* and the New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

117. Ms. Velez is entitled to an award of liquidated damages pursuant to New York State Labor Law § 198 in an amount not less than $21,000.00, plus interest.

## SEVENTH CLAIM OF RELIEF
## New York State Spread of Hours

118. Ms. Velez realleges and incorporates by reference each and very allegation contained in the preceding paragraphs as if set forth fully herein.

119. The Defendant's willful failure to pay Ms. Velez an extra hour's pay for every day that Ms. Velez worked in excess of 10 hours violates New York State Labor Law §§ 190, *et. seq.* and 650, *et seq.* and New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4.

120. Ms. Velez is entitled to an award of an extra hour's pay for each work day, where the interval between the beginning and end of her work day exceeded 10 hours and liquidated damages pursuant to New York State Labor Law §§ 190, *et. seq.*, 198, 650, *et. seq.*, 663 and the New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4, in an amount not less than $3,500.00, plus interest.

## EIGHTH CLAIM OF RELIEF
### Intentional Infliction of Emotional Distress

121. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

122. During the course of Ms. Velez's employment, the Defendant intentionally harassed and inflicted emotional injury on Ms. Velez by subjecting her to outrageous treatment wherein Ms. Velez was verbally, mentally and physically abused and was treated in a demeaning and inferior manner by the Defendant.

123. The Defendant intentionally caused Ms. Velez emotional distress by forcing her to serve as the Defendant's domestic worker; threatening to have the legal authorities take her into custody should she disobey the Defendant's orders; prohibiting Ms. Velez from establishing any relationship with people other than the Defendant, the Defendant's mother, and the Defendant's sister; monitoring her communications; preventing her from attending high school; and refusing to pay her a salary.

124. The Defendant's behavior to Ms. Velez was so outrageous that it extended outside the bounds tolerated by society.

125. The Defendant's actions caused Ms. Velez severe distress.

126. Ms. Velez is entitled to damages in an amount not less than $300,000.00.

## NINTH CLAIM OF RELIEF
### Fraudulent Inducement

127. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

128. The Defendant intentionally and knowingly misrepresented to Ms. Velez the conditions of Ms. Velez's employment in the United States in order to induce her to come to the

United States, under the pretense that Ms. Velez would be able to attend high school and would only be responsible for caring for the Defendant's baby a few hours a day.

129. The Defendant made the above misrepresentations, including the promises that Ms. Velez would complete high school in the United States, would have a life like any normal, teenage girl, and would be paid a salary for caring for the Defendant's baby with the intention that Ms. Velez would rely on such in order to entice Ms. Velez to come to the United States and to force her to work as a domestic servant in the Defendant's household.

130. Ms. Velez did in fact rely on the Defendant's misrepresentations to her detriment and as a result was forced to work as a domestic worker for the Defendant.

131. As a direct and proximate result of these actions, Ms. Velez has sustained damages in an amount not less than $300,000.00.

## TENTH CLAIM OF RELIEF
### Negligent Misrepresentation

132. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

133. Ms. Velez had a special relationship with the Defendant that involved a closer degree of trust or confidence than an ordinary, buyer-seller relationship involving arms-length, business transactions.

134. As a result of this special relationship, the Defendant had a duty to give Ms. Velez correct information about the scope and conditions of her visit to and employment in the United States, as well as the amount of wages she would receive for her employment.

135. However, the Defendant intentionally supplied information that she knew to be false, including promises that Ms. Velez would be able to complete her high school education in the United States while working for the Defendant and that Ms. Velez would receive pay for her work. These promises were made for the purpose of inducing Ms. Velez to rely and act upon this false information.

136. As a direct and proximate result of these actions, Ms. Velez suffered emotional and economic injuries. Ms. Velez requests damages of an amount of not less than $300,000.00.

## ELEVENTH CLAIM OF RELIEF
## Unjust Enrichment

137. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

138. Ms. Velez rendered services as a live-in domestic servant to the Defendant in good faith and with the expectation that she would be compensated for such services.

139. The Defendant accepted these services and in turn failed to compensate Ms. Velez for the fair market value of her services.

140. The Defendant has been unjustly enriched at Ms. Velez's expense. Ms. Velez request damages of an amount not less than $144,000.00.

## TWELFTH CLAIM FOR RELIEF
## Breach of Contract

141. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

142. The Defendant and Ms. Velez entered into an employment agreement, where Ms. Velez agreed to care for the Defendant's baby and the Defendant agreed to pay Ms. Velez for

her services as well as provide Ms. Velez with the means to complete her high school education in the United States.

143. The Defendant intentionally and willfully failed and refused to pay Ms. Velez the minimum wage and overtime wages and failed to provide Ms. Velez with the means and opportunity to complete her high school education, which constitutes a material breach of the employment agreement.

144. As a result, Ms. Velez has been damaged in an amount not less than $81,000.00, plus interest.

## THIRTEENTH CLAIM FOR RELIEF
### Assault

145. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

146. The Defendant intentionally placed Ms. Velez in apprehension of an imminent offensive or harmful touching.

147. Ms. Velez's apprehension was reasonable.

148. The Defendant's threat was independent of any physical contact.

149. Ms. Velez request damages in an amount not less than $50,000.00.

## FOURTEENTH CLAIM FOR RELIEF
### Battery

150. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

151. The Defendant intentionally and offensively touched Ms. Velez without her consent on both November 8, 2003 and November 11, 2003.

152. The contact was offensive in that a reasonable person would find it offensive to their personal dignity, even if no physical harm resulted.

153. The Defendant's actions were intentional in that the Defendant had personal knowledge to a substantial certainty that harmful or offensive contact would result from the Defendant's action.

154. Ms. Velez requests damages in an amount not less than $50,000.00.

## FIFTEENTH CLAIM FOR RELIEF
### Breach of Duty Under Law

155. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

156. Under New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, Ms. Velez was required to attend school during the school year that began September 2001 when Ms. Velez was sixteen years of age, unless she withdrew from school and received specific certification allowing her to work full-time in lieu of attending school.

157. Under New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, Ms. Velez was prohibited from working, unless she first obtained an employment certificate or permit.

158. Under New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, the Defendant was prohibited from employing Ms. Velez without Ms. Velez first obtaining an employment certificate or permit.

159. The Defendant required Ms. Velez to work excess hours in violation of New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, which prohibit children aged sixteen and seventeen from working more than 8 hours per day, not to

25

exceed 48 hours per week or 6 days per week or after 12 midnight or before 6 a.m. when school is not in session.

160. Defendant prohibited Ms. Velez from enrolling in school and required instead that Ms. Velez work 17 hours per day caring for Defendant's children and tending her home in violation of the aforementioned statutes.

161. Ms. Velez was denied her legally entitled high school education and was damaged in an amount of not less than $300,000.

**WHEREFORE,** Plaintiff respectfully requests that judgment be granted as follows:

(a)   Money damages in the amount sought for each Claim for Relief;

(b)   Attorney's fees and costs for Plaintiff against Defendant; and

(c)   Such other further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury.

Dated: New York, New York
November 5, 2004

CITY UNIVERSITY SCHOOL OF LAW
MAIN STREET LEGAL SERVICES
INTERNATIONAL WOMEN'S HUMAN
RIGHTS CLINIC

By _____
Andrew Fields [AF 7795]
65-21 Main Street
Flushing, New York 13367
(718) 340-3400

26