UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

LINDA VELEZ,

        Plaintiff,

          - against -

BETSY SANCHEZ, YOLANDA MUNOZ,
       and SHARI MUNOZ

       Defendants.

------------------------------------------------------------------x

Index No. 04-CV-04797 (FB) (CLP)


**AMENDED COMPLAINT**


JURY TRIAL
DEMANDED


Linda Velez, by and for her Complaint in the above-captioned matter, alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff, Linda Velez, brings this action to obtain unpaid wages, overtime premiums, and damages from the Defendants for violations of federal, New York State, and international law.  Ms. Velez was brought to this country under false pretenses when she was 17 years old and was required to work without pay subject to threats made by the Defendants and was prevented from attending school.  As a result, she is owed damages in an amount not less than $750,000.00

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).  This Court has supplemental jurisdiction over Ms. Velez's state law claims pursuant to 28 U.S.C. § 1367.  This Court has jurisdiction over Ms. Velez's international law claims pursuant to 28 U.S.C. §§ 1331, 1350 and 1367.

3.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events that give rise to this action occurred within this district and the Defendants reside within this district.

## PARTIES

4.   Plaintiff, Linda Velez, is a citizen of Ecuador who resides in the State of New York.

5.   Upon information and belief Defendant Betsy Sanchez resides at 56-09 184 Street, Fresh Meadows, NY 11365.

6.   Upon information and belief, Defendant Shari Munoz resides at 138-37 Jewel Avenue, Flushing, NY 11367.

7.   Upon information and belief, Defendant Yolanda Munoz resides at 56-09 184 Street, Fresh Meadows, NY 11365.

## STATEMENT OF FACTS

8.   Linda Velez was born on March 23, 1985, in Ecuador.

9.   In August 2001, Ms. Velez was sixteen years old and attending high school in Ecuador. She lived with her mother and stepfather.

10.  Ms. Velez's stepfather has two daughters from a prior relationship with Defendant Yolanda Munoz:  Defendant Betsy Sanchez, who, upon information and belief was thirty-one years old at the time Ms. Velez came to the United States, and Defendant Shari Munoz, who, upon information and belief, was twenty-eight years old at the time Ms. Velez came to the United States.

<u>Promises Made to Entice Ms. Velez to Come to New York</u>

11. In August 2001, Defendant Sanchez asked Ms. Velez's stepfather if Ms. Velez would like to move to New York to live with her, to finish her studies in the United States, and to care for Defendant Sanchez's newborn baby, Nicole.

12. Defendant Sanchez promised Ms. Velez's stepfather that she would pay Ms. Velez $80.00 per week to care for her newborn baby.

13. Defendant Sanchez promised that Ms. Velez would only have to care for her baby Monday thru Friday, during the hours that Defendant Sanchez was at work.

14. Defendant Sanchez promised that Ms. Velez would be able to finish high school in the evenings and have a normal, teenage life in the United States. Defendant Sanchez also stated that Ms. Velez would be able to attend college in the United States.

15. In addition to her promises that she would send Ms. Velez to high school in the United States, Defendant Sanchez promised Ms. Velez that she would pay for her college tuition and would even take out a loan from the bank so that Ms. Velez could go to college in the United States.

16. During several additional phone conversations with Ms. Velez's stepfather, Defendant Sanchez repeatedly promised him that if Ms. Velez left Ecuador and moved to New York:

   a. Ms. Velez would finish high school in the United States so that she could then attend college in the United States,

   b. Ms. Velez would have to care for Defendant Sanchez's newborn baby only during the limited hours that Defendant Sanchez was at work, and

   c. Ms. Velez would be paid $80.00 per week for this work.

17. On several occasions, Defendant Sanchez also made these promises directly to Ms. Velez over the phone when she called to further encourage Ms. Velez to move to New York.

18. During one of these calls, Defendant Sanchez told Ms. Velez that she had been shopping for a new bed for Ms. Velez and that if she chose to move to New York, she would also have her own bedroom.

19. Because Ms. Velez wanted to pursue her education in the United States, she accepted Defendant Sanchez's offer.

20. Ms. Velez gave up her life in Ecuador by leaving her family, her friends, and her high school behind.

21. Ms. Velez made it clear to Defendant Sanchez that she wanted to come to the United States to pursue her education.

22. Ms. Velez agreed to care for Defendant Sanchez's newborn baby when Defendant Sanchez was at work under the condition that she would be paid for the work and that she would be able to attend high school in New York.

23. Moreover, Ms. Velez decided to accept this arrangement based on her good relationship with Defendant Sanchez, which developed over Defendant Sanchez's annual visits to Ecuador.  Ms. Velez believed Defendant Sanchez would keep her promises.

24. Ms. Velez believed and trusted that Defendant Sanchez would take care of her in New York as she had promised Ms. Velez and her stepfather on numerous occasions.

25. At the time Ms. Velez left Ecuador, she was a successful student at a well-regarded private school.

26. Ms. Velez left Ecuador half way through her tenth grade year, with one and one-half years left to graduate.

27.  Ms. Velez's ultimate goal in coming to the United States was to finish high school and to attend college in the United States.

Arrival in New York

28.  Defendant Sanchez invited Ms. Velez to come to the United States and purchased Ms. Velez's airplane ticket for her.

29.  On or about September 22, 2001, Ms. Velez arrived at New York in John F. Kennedy Airport, as Defendant Sanchez had arranged.

30.  Upon arrival, Defendant Sanchez deceived Ms. Velez into giving Defendant Sanchez her passport, claiming Defendant Sanchez would keep the passport so Ms. Velez would not lose it.

31.  Subsequently, Defendant Sanchez refused to return Ms. Velez's passport to her.

32.  At Defendant Sanchez's apartment in Fresh Meadow, Queens, Ms. Velez did not have her own room and was required to sleep on the sofa in the living room for almost a year.

33.  Thereafter, Defendant Sanchez placed a small cot bed in her daughter Nicole's room for Ms. Velez.

34.  When Defendant Sanchez's second baby, Erica, was born, in order to make room for the three of them, Defendant Sanchez purchased a bunk bed that Ms. Velez was required to share with Nicole.  This enabled Ms. Velez to continue her care of the Defendant Sanchez's children during the night.

Breach of Agreement

35.  Defendant Sanchez failed to abide by her agreement with Ms. Velez.  The working conditions were not as Defendant Sanchez had promised.  Defendant Sanchez demanded far more work from Ms. Velez than they agreed to when Ms. Velez was in Ecuador.  Ms.

Velez was not just required to care for Defendant Sanchez's children, but was forced to do the household tasks of a domestic worker.

36. Upon Ms. Velez's arrival in New York, Defendant Sanchez spent two months at home with Ms. Velez training her to care for Defendant Sanchez's newborn baby, Nicole.

37. During these two months, Ms. Velez worked on average from 8:00 a.m. to 10:00 p.m. Monday thru Friday and from 10:00 a.m. to 10:00 p.m. Saturdays and Sundays, despite Defendant Sanchez's earlier promise that Ms. Velez would only have to work for limited hours Monday thru Friday.

38. Defendant Sanchez did not pay Ms. Velez for her work during these first two months when Defendant Sanchez was on maternity leave. Defendant Sanchez told Ms. Velez that she did not have the money to pay Ms. Velez at that time. Defendant Sanchez promised to pay Ms. Velez as soon as she went back to work.

39. After two months, Defendant Sanchez left Ms. Velez in the home to care for Nicole in Defendant Sanchez's home full time. Ms. Velez became Nicole's primary caretaker.

40. As Nicole's primary caretaker, Ms. Velez's childcare responsibilities included, but were not limited to, feeding her all meals, changing her diapers, bathing her, playing with her, keeping a close eye on her throughout the day and night, and tending to her in the middle of the night should she awake.

41. In addition to requiring Ms. Velez to care for the newborn baby, Defendant Sanchez also required Ms. Velez to serve as a domestic worker and perform nearly all of the household's chores.

42. The amount of household chores Defendant Sanchez demanded of Ms. Velez increased with time.

43.   Ms. Velez's daily household responsibilities included, but were not limited to, preparing all meals for the family, washing the dishes, sweeping and mopping the floors, dusting the furniture in the house, making the beds, cleaning the bathrooms (including scrubbing the toilets), cleaning the kitchen, washing the family's laundry at home and then taking the wet laundry to the local laundromat to dry.

44.   Defendant Sanchez continued to require Ms. Velez to work more than 12 hours per day; if Ms. Velez failed to do so, Defendant Sanchez would get very angry and punish her.

45.   After Defendant Sanchez returned to work in November 2001, Ms. Velez worked approximately 17 hours a day, from Monday through Friday from 6:00 a.m. to 11:00 p.m. and was on-call 24 hours a day.  If Nicole woke up in the middle of the night, Ms. Velez was required to care for her and stay with her until she fell asleep again.  This occurred on average one to two times a night.  During this period, Ms. Velez worked from approximately 8:00 a.m. to 10:00 p.m. on Saturdays and Sundays.

46.   Defendant Sanchez did not pay Ms. Velez for her work, even after Defendant Sanchez returned to work.

47.   Because Defendant Sanchez never paid Ms. Velez for her work, Ms. Velez was required to get a part-time job outside of the home in order to pay for her expenses.

48.   Starting in June 2002, Ms. Velez attended English-language classes when her work schedule permitted.  Ms. Velez paid for these classes with the money she earned working outside of Defendant Sanchez's home on the weekends.  Defendant Sanchez required Ms. Velez to care for Nicole from 6:00 a.m. to 11:00 p.m. Monday thru Friday and when Ms. Velez arrived at home on the weekends around 7:00 p.m. or 8:00 p.m.

49. This schedule continued until October 2002, when Defendant Sanchez gave birth to her second baby, Erica, and required Ms. Velez to quit her job and the English-language classes she was taking in order to resume working for Defendant Sanchez seven days a week.  Ms. Velez was required to care for Defendant Sanchez's two children as well as do all of the housework from 6:00 a.m. to 11:00 p.m. Monday thru Friday and from 8:00 a.m. to 10:00 p.m. on Saturday and Sunday.

50. Ms. Velez wanted to resume her job outside Defendant Sanchez's home, but was not allowed to do so.  Defendant Sanchez told Ms. Velez that if she took another job outside of the home then she would have to give a portion of that income to Defendant Sanchez.

51. Ms. Velez was still required to tend the children if they woke in the night.  After Erica was born this occurred on average two to three times a night.

52. For the first two years, Defendant Sanchez did not pay Ms. Velez any money for her work as the children's primary caretaker and the family's domestic worker.

53. When Ms. Velez asked Defendant Sanchez about her salary, Defendant Sanchez would get mad.  She would often respond that she did not have the money at that time, that Ms. Velez needed to wait a while longer, or she would become verbally abusive.  On occasion, Defendant Sanchez also threatened to have Ms. Velez returned to Ecuador without being paid.  On other occasions, Defendant Sanchez would tell Ms. Velez not to worry because she promised to pay for Ms. Velez's college tuition.

54. As time passed, it became apparent that Defendant Sanchez had effectively denied Ms. Velez the opportunity to finish high school by refusing to permit her to enroll in the public schools.

55. Nevertheless, Ms. Velez was determined to get a high school degree and she therefore enrolled in a GED course in July 2003. The course began in September 2003 at La Guardia Community College and classes were to be held on Saturdays.

56. Defendant Sanchez promised Ms. Velez she would pay the tuition for this course.

57. In or around September 2003, Defendant Sanchez promised to pay Ms. Velez variously $30.00 or $50.00 per week to cover her living and travel expenses, such as bus fare to get her to the GED course. Defendant Sanchez agreed to pay this money on the condition that Ms. Velez would not ask her for anything else. However, Defendant Sanchez failed to pay this money on a weekly basis as agreed.

58. At the end of August, when it was time to pay the tuition for the GED course, Defendant Sanchez reneged on her promise to pay the tuition and told Ms. Velez that she did not have the money. In order to preserve her seat in the course, Ms. Velez asked Defendant Sanchez if she would pay her two months advance living and travel money to be used for tuition. Defendant Sanchez gave Ms. Velez $200.00 as her two months advance to pay the tuition for the GED course. The $200.00 is the only money Defendant Sanchez gave Ms. Velez during the more than two years that Ms. Velez had worked for Defendant Sanchez.

The Defendants Prohibited Ms. Velez from Going to High School

59. Throughout this period, Defendant Sanchez prohibited Ms. Velez from attending and completing high school.

60. Defendant Sanchez deprived Ms. Velez of the opportunity to complete her high school education when she refused to permit Ms. Velez to attend school and refused to pay Ms. Velez her salary, so she was unable to pay for her own weekend classes.

61. During the school year that began in September 2001, Ms. Velez was sixteen years of age.  Under New York State law, she was required to attend school, unless she withdrew from school and received specific certification allowing her to work full-time in lieu of attending school.

62. Ms. Velez never withdrew from school pursuant to the procedures required under New York law.  Indeed, she actively sought to continue her high school education but was prohibited from enrolling in school by Defendant Sanchez, who required instead that Ms. Velez work up to 17 hours per day caring for Defendant Sanchez's children and tending her home.

63. Ms. Velez came to the United States with the specific intention of attending school and neither Ms. Velez nor her parents consented that she should not be in school.

64. Even when school is not in session, New York State law prohibits children aged sixteen and seventeen from working more than 8 hours per day, not to exceed 48 hours per week or 6 days per week or after 12 midnight or before 6 a.m.

65. Moreover, children aged sixteen and seventeen may only work if they receive an employment certificate or permit pursuant to New York Education Law and New York Labor Law.

66. During Ms. Velez's first nine months at Defendant Sanchez's home, Ms. Velez asked Defendant Sanchez on numerous occasions about attending high school and the Defendant replied that she was looking into it.

67. Eventually, Defendant Sanchez told Ms. Velez that she could not attend high school because the only high school in the area with evening classes was for problem students and Ms. Velez was not eligible.

10

68. In July 2003, Defendant Sanchez promised Ms. Velez she would pay the tuition for the GED course that Ms. Velez had enrolled in at LaGuardia Community College.

69. When classes began in September, Defendant Sanchez still expected Ms. Velez to take care of Nicole and her second baby, Erica, during the week and when Ms. Velez returned to Defendant Sanchez's home at night on weekends.

<u>Additional Facts Demonstrating Aiding and Abetting and Conspiracy by Defendants Shari Munoz and Yolanda Munoz</u>

70. Throughout the period relevant to this Amended Complaint, Defendants Shari Munoz and Yolanda Munoz were aware that Ms. Velez was being prohibited from going to high school, was not being paid, and that she was not free to act consistent with her wishes.

71. Defendants Yolanda Munoz and Shari Munoz conspired with and provided material assistance to Defendant Sanchez in her efforts to keep Ms. Velez in a condition of involuntary servitude, to deprive her of a high school education, to prevent her from being paid, and to prevent her from seeking assistance of others who might help her escape from her conditions in the home of Defendant Sanchez.

72. Upon information and belief, Defendants agreed to monitor Ms. Velez's actions and prevent her from seeking assistance from others so that she would not be able to leave her circumstances.  In furtherance of this agreement, Defendants listened to Ms. Velez's phone calls, prevented her from interacting with others, punished her for breaching these conditions, threatened physical harm to Ms. Velez, and threatened to send Ms. Velez to Ecuador.

73. Defendant Yolanda Munoz, the mother of Defendant Sanchez and the grandmother of Ms. Velez's charges, Erica and Nicole, was frequently present with Ms. Velez and the children either at the home of Defendant Sanchez or her own home on.

74. On these occasions, Defendant Yolanda Munoz would supervise Ms. Velez's childcare and domestic service activities, would direct Ms. Velez's chores, would monitor her communications with telephone callers, and would prohibit her from going outside where she might interact with others.

75. When Ms. Velez would complain to Defendant Yolanda Munoz that she had not yet been permitted to enroll in school and that she had not been paid, Defendant Yolanda Munoz instructed Ms. Velez to be patient and stated that Ms. Velez would ultimately be paid and be able to go to school.  She further indicated that Ms. Velez's college would be paid for.

76. Defendant Yolanda Munoz made these statements to Ms. Velez knowing that they were not true and with an intention of placating Ms. Velez and discouraging her from asserting her rights.

77. Defendant Yolanda Munoz would report on Ms. Velez's activities to Defendants Sanchez and Shari Munoz.

78. Defendant Yolanda Munoz's conduct resulted in her giving substantial and knowing practical assistance and encouragement to Defendant Sanchez in her efforts to keep Ms. Velez in a condition of involuntary servitude, to deprive her of a high school education, to prevent her from being paid, and to prevent her from seeking assistance of others who might help her escape from her conditions in the home of Defendant Sanchez.

79. Defendant Shari Munoz was also present on numerous occasions in the home of Defendant Sanchez during which times she would monitor the activities of Ms. Velez, restrict her activities, and report back to Defendant Sanchez.

80. When Ms. Velez would complain to Defendant Shari Munoz that she had not yet been permitted to enroll in school and that she had not been paid, Defendant Shari Munoz

instructed Ms. Velez to be patient and stated that Ms. Velez would ultimately be paid and be able to go to school. She further indicated that Ms. Velez's college would be paid for.

81. Defendant Shari Munoz made these statements to Ms. Velez knowing that they were not true and with an intention of placating Ms. Velez and discouraging her from asserting her rights.

82. Defendant Shari Munoz would report on Ms. Velez's activities to Defendants Sanchez and Yolanda Munoz.

83. Defendant Shari Munoz's conduct resulted in her giving substantial and knowing practical assistance and encouragement to Defendant Sanchez in her efforts to keep Ms. Velez in a condition of involuntary servitude, to deprive her of a high school education, to prevent her from being paid, and to prevent her from seeking assistance of others who might help her escape from her conditions in the home of Defendant Sanchez.

84. Further, all of the Defendants agreed and understood that the purpose of their meetings, agreements, and actions as described above as well as their methods of achieving this purpose, were unlawful and would result in injury to Ms. Velez, and agreed and understood that each would act in concert with the others to achieve this purpose.

The Confinement

85. Defendant Sanchez confiscated Ms. Velez's passport at the time she arrived and refused to return it.

86. Ms. Velez was not permitted to speak freely to anyone other than Defendants Sanchez, Shari Munoz, and Yolanda Munoz. In particular, Ms. Velez was prohibited by all of the Defendants from speaking freely with the Defendants' in-laws, who were sympathetic to

her.  Ms. Velez was not permitted to tell anyone that she was not being paid or that she was not enrolled in school.

87.   Moreover, all of the Defendants prohibited Ms. Velez from freely choosing her daily activities, even during times when she was not required to work.  The Defendants required Ms. Velez to obtain permission from at least one of them before Ms. Velez could visit friends, get another job, attend classes or do any other personal activity.

88.   Defendants Sanchez, Yolanda Munoz, and Shari Munoz were frequently verbally abusive to Ms. Velez.  The Defendants also frequently threatened to send Ms. Velez back to Ecuador when they were angry at her for not heeding the Defendants' demands.  Ms. Velez feared the Defendants and was afraid to defy their orders because of the verbal abuse.

89.   When Ms. Velez disobeyed any of the Defendants, the punishment was harsh.  For example, on October 6, 2003, when Ms. Velez returned home 30 minutes later than she was permitted, Defendant Sanchez locked Ms. Velez out of the house.  Ms. Velez had no other place to go.

90.   Defendant Sanchez's refusal to pay Ms. Velez left her with no resources of her own that would permit her to leave Defendant Sanchez's house.

91.   Defendants Sanchez, Yolanda Munoz, and Shari Munoz each denied Ms. Velez the promised opportunity of completing her education, which thwarted Ms. Velez's ability to develop, and limited Ms. Velez's contact with the outside world.

92.   As a minor, in another country, who did not speak the language, and had not completed high school, Ms. Velez was particularly susceptible to the Defendants' threats and control.  Ms. Velez's will was overcome by the Defendants and she was unable to leave.

93. Beginning in or about October 2002, Defendant Sanchez arranged for her mother, Defendant Yolanda Munoz, to come to the house while Defendant Sanchez was at work, to monitor Ms. Velez's actions, and to report back to Defendant Sanchez.

94. Throughout the time Ms. Velez was living with Defendant Sanchez, Defendant Sanchez listened in on Ms. Velez's phone conversations with her family and friends in Ecuador. Ms. Velez was not aware of and did not consent to this eavesdropping.

95. On other occasions, Defendant Yolanda Munoz also listened in on Ms. Velez's phone conversations to Ms. Velez's family in Ecuador.  Ms. Velez was not aware of and did not consent to this eavesdropping.

96. Defendants Sanchez, Yolanda Munoz, and Shari Munoz isolated Ms. Velez by constantly monitoring her activities, not allowing her to meet and go out with friends, and by requiring her to stay in the kitchen when they had company in the house.

97. Defendant Sanchez's in-laws were sympathetic to Ms. Velez's plight and reached out to her.  The Defendants all went to great pains to keep Ms. Velez away from Defendant Sanchez's in-laws to prevent the in-laws from learning the truth of Ms. Velez's situation and to prevent them from assisting her.

98. Defendants instructed Ms. Velez to lie to the in-laws about her situation.  Specifically, Defendants instructed Ms. Velez to tell Defendant Sanchez's in-laws that Ms. Velez was being paid and that variously she was attending school or that arrangements were being made for Ms. Velez to go to school.

99. Defendants prohibited Ms. Velez from attending family outings, from being present in the apartment, and from going outside if they suspected that Ms. Velez might have the opportunity to interact with the in-laws during these occasions.

100. If any of the Defendants learned of Ms. Velez communicating with the in-laws, they would punish Ms. Velez, and frequently did so even when their suspicions were incorrect.

101. Ms. Velez was required to give Defendant Sanchez one week's notice if she wanted to visit with friends.

102. Defendant Sanchez was a domineering and controlling person who often showed anger to Ms. Velez, verbally abused, and threatened to send Ms. Velez to Ecuador without receiving any pay.

103. Moreover, Ms. Velez feared Defendant Sanchez would become violent if she defied the Defendant Sanchez's wishes.  Therefore, Ms. Velez made every effort not to provoke Defendant Sanchez.

104. Ms. Velez was similarly afraid of Defendant Shari Munoz, who told Ms. Velez that she would be physically injured if she did not listen to the instructions of any of the Defendants.

The Assaults

105. Ms. Velez's fears that Defendant Sanchez would become violent were realized on November 8, 2003 and November 11, 2003, when Defendant Sanchez did in fact lash out in violence.

106. The Defendants attempted to control Ms. Velez even when she was not working in the home.  On one occasion, on November 8, 2003, Ms. Velez went to visit a friend after obtaining permission from Defendant Sanchez.  Defendant Sanchez was suspicious that Ms. Velez was actually receiving assistance from Defendant Sanchez's in-laws and not

visiting with a friend. Consequently, Defendant Sanchez tracked Ms. Velez down and

sent her sister, Defendant Shari Munoz, to retrieve and threaten Ms. Velez.

107. Later that same evening, Defendant Sanchez physically forced Ms. Velez into Defendant

Shari Munoz's car in an effort to keep Ms. Velez away from the Defendant Sanchez's in-

laws who came to Defendant Sanchez's home to advocate for Ms. Velez. Defendant

Sanchez directed Defendant Shari Munoz to drive off with Ms. Velez, which she did.

108. Ms. Velez was afraid and begged Defendant Shari Munoz to take her back to the

Defendant Sanchez's home, where she hoped for an intervention by the Defendant

Sanchez's in-laws on her behalf. Ms. Velez was afraid Defendant Shari Munoz was

taking her back to Ecuador as threatened. Ms. Velez was also physically afraid of

Defendant Shari Munoz, who she believed to have been a gang member when she was

younger.

109. When the car continued to drive away even after Ms. Velez demanded to be let out of the

car, Ms. Velez was forced to jump from the moving vehicle. Defendant Shari Munoz

drove off and left Ms. Velez behind. Ms. Velez's leg was injured from the jump and she

was in pain as a result of this incident. Because Ms. Velez did not have anywhere else to

go, she returned to Defendant Sanchez's house.

110. On November 11, 2003, when Ms. Velez finally expressed her intent to leave Defendant

Sanchez's home, her fears about Defendant Sanchez's propensity to violence were

realized. Defendant Sanchez became very angry and verbally abusive. Defendant

Sanchez also threatened to send Ms. Velez back to Ecuador by force.

111. Ms. Velez sought the assistance of Defendant Sanchez's husband, but Defendant Sanchez kept him out of the house.  Ms. Velez also sought the assistance of Defendant Sanchez's in-laws, but they were also kept out of the house.

112. On November 11, 2003, while Ms. Velez was packing her belongings in garbage bags to move out of Defendant Sanchez's home, Defendant Sanchez grabbed Ms. Velez, shook her and threw Ms. Velez to the ground.  Defendant Sanchez then grabbed Ms. Velez's belongings from the bags and threw them all over the floor.  Defendant Sanchez told Ms. Velez that she could not take anything from the house. Ms. Velez finally left without her belongings.

113. Because of the commotion at the house, the police were called.  When they arrived, Defendant Sanchez told the police that Ms. Velez was an illegal immigrant who should be taken into custody and returned to Ecuador.  The police rejected Defendant Sanchez's request and Ms. Velez departed.

114. The next day, Defendant Sanchez went to the police station and made a report accusing Ms. Velez of stealing Defendant Sanchez's engagement ring and having a relationship with Defendant Sanchez's husband.  The police did not find merit in Defendant Sanchez's accusations and took no further action.

115. Shortly after Ms. Velez left Defendant Sanchez's home, Defendant Sanchez and Defendant Shari Munoz stole Ms. Velez's purse that contained the ID card issued to her by the Ecuadorian consulate; the ID card for La Guardia Community College; other personal papers; and $80.00 in cash.

116. Upon learning that Defendants knew of Ms. Velez's address by virtue of their having taken her purse, Ms. Velez was forced to move to a new location unknown to Defendants.

117. Even after Ms. Velez left Defendant Sanchez's home, she was subjected to continuing acts intended to harass and intimidate her. Defendant Shari Munoz sent a letter to Ms. Velez's biological father untruthfully suggesting that Ms. Velez was engaged in an extramarital affair.

118. Upon information and belief, Defendants also asked relations in Ecuador to surreptitiously learn of Ms Velez's whereabouts from Ms. Velez's mother and stepfather, so that they could continue to threaten and harass Ms. Velez.

### FIRST CLAIM FOR RELIEF
### Involuntary Servitude
### U.S. Constitution and Federal Statute
### (All Defendants)

119. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

120. Ms. Velez brings this claim for relief under the private cause of action implied under the Thirteenth Amendment of the United States Constitution, and under 42 U.S.C. § 1994 and 18 U.S.C. §§ 1581, 1584.

121. As alleged herein, Defendants used threats of physical harm and mental, physical and legal coercion to induce Ms. Velez to work against her will, requiring her to work without pay.

122. Defendants' threats and coercion caused Ms. Velez to reasonably believe that she had no alternative but to continue her service for Defendant Sanchez.

123. As a minor, Ms. Velez was particularly vulnerable to such threats and coercion.

124. Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with a criminal indifference to civil obligations, and with the wrongful intent of injuring Ms. Velez and in conscious disregard of Ms. Velez's rights.

125. Through such actions, Defendants directed, assisted, conspired and acted in concert with each other to create and enforce a system of involuntary servitude prohibited by the Thirteenth Amendment of the United States Constitution, and 42 U.S.C. § 1994, and 18 U.S.C. §§ 1581, 1584.

126. As a direct and proximate result of these actions, Ms. Velez has sustained damages, including emotional distress, economic losses, and physical injury, entitling her to damages of no less than $500,000.00.

### SECOND CLAIM FOR RELIEF
### Alien Tort Claims Act
### Trafficking
### (Defendant Sanchez)

127. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

128. By inducing Ms. Velez to accept employment with her in the United States through fraud and deception for the purposes of subjecting her to a condition of involuntary servitude and forced labor, Defendant Sanchez engaged in trafficking of Ms. Velez in violation of the law of nations.

129. Defendants' actions were conceived of maliciously, in the spirit of mischief and a criminal indifference to civil obligations.

130. Defendant Sanchez's actions constitute torts in violation of the law of nations, and are actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

131. Numerous international instruments, customary international norms, domestic statutes and case law, and international case law establish human trafficking as violating the law of nations. Such authorities include: the Universal Declaration of Human Rights, Dec.

10, 1948, G.A. Res. 217A (Ill.), U.N. GAOR, 3rd Sess., U.N. Doc. A/ILO (1948); the International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, 61 I.L.M. 368 (1967); the Slavery Convention of 1926, Sept. 25 1926, 46 Stat. 2183, 60 U.N.T.S. 253; the Supplementary Slavery Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour, June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All Forms of Discrimination Against Women, December 18, 1979, 34 U.N. GAOR, 19 I.L.M. 33 (1980); and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, art. 3(a), G.A. res. 55/25, annex II, U.N. GAOR Supp. (No. 49) at 69, U.N. Doc. A/45/49 (Vol. I) 2001. These prohibitions against trafficking in persons are reflected in United States law in the Trafficking Victims Protection Act, 18 U.S.C. Sec. 1590, as well as other U.S. authorities.

132. As a direct and proximate result of these actions, Ms. Velez has sustained damages, including physical injury, emotional distress, and economic losses, entitling her to damages in an amount not less than $500,000.00.

## THIRD CLAIM FOR RELIEF
### Alien Tort Claims Act
### Involuntary Servitude, Forced Labor, and Enslavement
### (All Defendants)

133. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

134. Defendants, by inducing Ms. Velez to work against her will through the use of threats of serious harm and psychological, physical and legal coercion, subjected Ms. Velez to conditions of forced labor, involuntary servitude, and enslavement.

135. Through such actions, Defendants directed, assisted, conspired and acted in concert with each other to create and enforce a pattern of behavior intended to cause Ms. Velez to believe that if she did not perform such labor or services, she would suffer serious harm.

136. Defendants, by requiring Ms. Velez to work against her will through the use of threats of serious harm and psychological, physical, and legal coercion, subjected Ms. Velez to conditions of forced labor, involuntary servitude, and enslavement.

137. Defendants actions, requiring Ms. Velez to work against her will, were conceived of maliciously, in the spirit of mischief and a criminal indifference to civil obligations.

138. Defendants actions constitute torts in violation of the law of nations, and are actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

139. Numerous international instruments, customary international norms, domestic statutes and case law, and international case law establish modern manifestations of slavery such as involuntary servitude, enslavement, and forced labor as violations of the law of nations. Such authorities include: the Universal Declaration of Human Rights, Dec. 10, 1948, G.A. Res. 217A (Ill.), U.N. GAOR, 3rd Sess., art. 4, U.N. Doc. A/ILO (1948); the International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 8, 999 U.N.T.S. 171, 61 I.L..M 368 (1967); the Slavery Convention of 1926, Sept. 25 1926, 46 Stat. 2183, 60 U.N.T.S. 253; the Supplementary Slavery Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; the Convention Concerning Forced or Compulsory Labour, June

28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of Forced Labour, June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All Forms of Discrimination Against Women, December 18, 1979, art. 6, 34 U.N. GAOR, 19 I.L.M. 33 (1980); and the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, art. 3(a), G.A. res. 55/25, annex II, U.N. GAOR Supp. (No. 49) at 69, U.N. Doc. A/45/49 (Vol. I) 2001. These prohibitions against modern manifestations of slavery such as involuntary servitude, enslavement, and forced labor are reflected in United States law in the Trafficking Victims Protection Act, 18 U.S.C. Sec. 1589, as well as other U.S. authorities.

140. As a direct and proximate result of the actions described herein, Ms. Velez has sustained damages, including physical injury, emotional distress, and economic losses, entitling her to damages in an amount not less than $500,000.00.

<u>**FOURTH CLAIM FOR RELIEF**</u>
<u>**Federal Minimum Wage**</u>
<u>**(Defendant Sanchez)**</u>

141. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

142. Defendant Sanchez employed Ms. Velez within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 203(d)-(e).

143. Defendant Sanchez willfully failed to pay Ms. Velez minimum wages, in violation of 29 U.S.C. § 206(a) and the United States Department of Labor regulations.

144. Defendant Sanchez's willful violation of the Fair Labor Standards Act entitles Ms. Velez to recovery of her unpaid minimum wages which is not less than $62,000.00, an equal

amount as liquidated damages and reasonable attorneys' fees and costs of the action

pursuant to 29 U.S.C. §§ 201, *et seq.* and the United States Department of Labor

regulations, in addition to declaratory relief.

## FIFTH CLAIM FOR RELIEF
## New York State Minimum Wage and Overtime
## (Defendant Sanchez)

145. Ms. Velez realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

146. Defendant Sanchez employed Ms. Velez within the meaning of the New York State

Labor Law, N.Y. Labor Law §§ 2(5)-(7).

147. Defendant Sanchez's intentional and willful failure to pay Ms. Velez the minimum wages

required by law violates New York State Labor Law §§ 190, *et seq.* and 650, *et seq.* and

the New York State Department of Labor regulations, from commencement of

employment as a domestic worker from in or about September 2001, until approximately

November 2003.

148. Defendant Sanchez's willful failure to pay Ms. Velez overtime pay for work in excess of

44 hours per week violates New York State Labor law §§ 190, *et seq.* and 650, *et. seq.*

and the New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

149. Ms. Velez is entitled to an award of damages for unpaid minimum wages and unpaid

overtime in an amount of not less than $81,000.00, plus interest.

## SIXTH CLAIM FOR RELIEF
## New York State Liquidated Damages
## (Defendant Sanchez)

150. Ms. Velez realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

151. Defendant Sanchez employed Ms. Velez within the meaning of New York State Labor Law, N.Y. Labor Law §§ 2(5)-(7).

152. Defendant Sanchez's willful failure to pay Ms. Velez the minimum wages required by law violates New York State Labor Law §§ 190, *et. seq.* and 650, *et. seq.* and the New York State Department of Labor regulations.

153. Defendant Sanchez's willful failure to pay Ms. Velez overtime pay for work in excess of 44 hours per week violates New York State Labor Law §§ 190, *et. seq.* and 650, *et. seq.* and the New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

154. Ms. Velez is entitled to an award of liquidated damages pursuant to New York State Labor Law § 198 in an amount not less than $21,000.00, plus interest.

## SEVENTH CLAIM OF RELIEF
## New York State Spread of Hours
## (Defendant Sanchez)

155. Ms. Velez realleges and incorporates by reference each and very allegation contained in the preceding paragraphs as if set forth fully herein.

156. Defendant Sanchez's willful failure to pay Ms. Velez an extra hour's pay for every day that Ms. Velez worked in excess of 10 hours violates New York State Labor Law §§ 190, *et. seq.* and 650, *et seq.* and New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4.

157. Ms. Velez is entitled to an award of an extra hour's pay for each work day, where the interval between the beginning and end of her work day exceeded 10 hours and liquidated damages pursuant to New York State Labor Law §§ 190, *et. seq.*, 198, 650, *et. seq.*, 663 and the New York State Department of Labor regulations, 12 N.Y.C.R.R. §§ 137-1.6, 142-2.4, in an amount not less than $3,500.00, plus interest.

## EIGHTH CLAIM OF RELIEF
### Intentional Infliction of Emotional Distress
#### (All Defendants)

158. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

159. During the course of Ms. Velez's employment, Defendants intentionally harassed and inflicted emotional injury on Ms. Velez by subjecting her to outrageous treatment wherein Ms. Velez was verbally, mentally and physically abused and was treated in a demeaning and inferior manner.

160. Defendants intentionally caused Ms. Velez emotional distress by forcing her to serve as Defendant Sanchez's domestic worker; threatening to have the legal authorities take her into custody should she disobey Defendant Sanchez's orders; prohibiting Ms. Velez from establishing any relationship with people other than Defendant Sanchez, Defendant Yolanda Munoz, and Defendant Shari Munoz; monitoring her communications; preventing her from attending high school; and refusing to pay her a salary.

161. Defendants' behavior to Ms. Velez was so outrageous that it extended outside the bounds tolerated by society.

162. Defendant Sanchez's actions caused Ms. Velez severe distress.

163. Ms. Velez is entitled to damages in an amount not less than $500,000.00.

## NINTH CLAIM OF RELIEF
### Negligent Infliction of Emotional Distress
#### (All Defendants)

164. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

165. Defendants directly owed Ms. Velez a duty under the Thirteenth Amendment of the United States Constitution, 42 U.S.C. § 1994, 18 U.S.C. §§ 1581, 1584, and the law of nations that they breached by forcing Ms. Velez to work against her will through the use of threats of serious harm and psychological, physical and legal coercion, subjected Ms. Velez to conditions of forced labor, involuntary servitude, and enslavement.

166. Defendants breach of her duty directly owed to Ms. Velez both unreasonably endangered Ms. Velez's physical safety and caused Ms. Velez to fear for her own safety.

167. Defendants negligently caused Ms. Velez severe emotional distress by forcing her to serve as Defendant Sanchez's domestic worker; threatening to have the legal authorities take her into custody should she disobey Defendant Sanchez's orders; prohibiting Ms. Velez from establishing any relationship with people other than Defendants Sanchez, Yolanda Munoz, and Shari Munoz; preventing her from attending high school; refusing to pay her a salary; and threatening her both physically and with threats of sending her to Ecuador.

168. Ms. Velez is entitled to damages in an amount not less than $500,000.

## NINTH CLAIM OF RELIEF
### Fraudulent Inducement
### (Defendant Sanchez)

169. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

170. Defendant Sanchez intentionally and knowingly misrepresented to Ms. Velez the conditions of Ms. Velez's employment in the United States in order to induce her to come to the United States, under the pretense that Ms. Velez would be able to attend high

school and would only be responsible for caring for Defendant Sanchez's baby a few hours a day.

171. Defendant Sanchez made the above misrepresentations, including the promises that Ms. Velez would complete high school in the United States, would have a life like any normal, teenage girl, and would be paid a salary for caring for Defendant Sanchez's baby with the intention that Ms. Velez would rely on such in order to entice Ms. Velez to come to the United States and to force her to work as a domestic servant in the Defendant's household.

172. Ms. Velez did in fact rely on the Defendant's misrepresentations to her detriment and as a result was forced to work as a domestic worker for the Defendant.

173. Defendant Sanchez made the foregoing misrepresentations with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton, and such conduct has the character of outrage frequently associated with criminal conduct.

174. As a direct and proximate result of these actions, Ms. Velez has sustained damages in an amount not less than $500,000.00.

## TENTH CLAIM OF RELIEF
### Negligent Misrepresentation
### (Defendant Sanchez)

175. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

176. Ms. Velez had a special relationship with Defendant Sanchez that involved a closer degree of trust or confidence than an ordinary, buyer-seller relationship involving arms-length, business transactions.

177. As a result of this special relationship, Defendant Sanchez had a duty to give Ms. Velez correct information about the scope and conditions of her visit to and employment in the United States, as well as the amount of wages she would receive for her employment.

178. However, Defendant Sanchez intentionally supplied information that she knew to be false, including promises that Ms. Velez would be able to complete her high school education in the United States while working for Defendant Sanchez and that Ms. Velez would receive pay for her work. These promises were made for the purpose of inducing Ms. Velez to rely and act upon this false information.

179. As a direct and proximate result of these actions, Ms. Velez suffered emotional and economic injuries. Ms. Velez requests damages of an amount of not less than $500,000.00.

### ELEVENTH CLAIM OF RELIEF
### Unjust Enrichment
### (Defendant Sanchez)

180. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

181. Ms. Velez rendered services as a live-in domestic servant to Defendant Sanchez in good faith and with the expectation that she would be compensated for such services.

182. Defendant Sanchez accepted these services and in turn failed to compensate Ms. Velez for the fair market value of her services.

183. Defendant Sanchez has been unjustly enriched at Ms. Velez's expense.

184. Ms. Velez requests damages of an amount not less than $200,000.00.

### TWELFTH CLAIM FOR RELIEF
### Breach of Contract
### (Defendant Sanchez)

185. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

186. Defendant Sanchez and Ms. Velez entered into an employment agreement, where Ms. Velez agreed to care for Defendant Sanchez's baby and Defendant Sanchez agreed to pay Ms. Velez for her services as well as provide Ms. Velez with the means to complete her high school education in the United States.

187. Defendant Sanchez intentionally and willfully failed and refused to pay Ms. Velez the minimum wage and overtime wages and failed to provide Ms. Velez with the means and opportunity to complete her high school education, which constitutes a material breach of the employment agreement.

188. Defendant Sanchez failed and refused to pay Ms. Velez the minimum wage and overtime wages and failed to provide Ms. Velez with the means and opportunity to complete her high school education with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton, and such conduct has the character of outrage frequently associated with criminal conduct.

189. As a result, Ms. Velez has been damaged in an amount not less than $200,000.00, plus interest.

### THIRTEENTH CLAIM FOR RELIEF
#### Assault
#### (Defendants Sanchez and Shari Munoz)

190. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

191. Defendant Sanchez intentionally placed Ms. Velez in apprehension of an imminent offensive or harmful touching.

192. Ms. Velez's apprehension was reasonable.

193. Defendant Sanchez's threat was independent of any physical contact.

194. Defendant Sanchez's threat was commited with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton.

195. Defendant Shari Munoz intentionally placed Ms. Velez in apprehension of an imminent offensive or harmful touching.

196. Ms. Velez's apprehension was reasonable.

197. Defendant Shari Munoz's threat was independent of any physical contact.

198. Defendant Shari Munoz's threat was commited with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton.

199. Ms. Velez request damages in an amount not less than $200,000.00.

<u>**FOURTEENTH CLAIM FOR RELIEF**</u>
<u>**Battery**</u>
<u>**(Defendants Sanchez and Shari Munoz)**</u>

200. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

201. Defendant Sanchez intentionally and offensively touched Ms. Velez without her consent on both November 8, 2003 and November 11, 2003.

202. The contact was offensive in that a reasonable person would find it offensive to their personal dignity, even if no physical harm resulted.

203. Defendant Sanchez's actions were intentional in that Defendant Sanchez had personal knowledge to a substantial certainty that harmful or offensive contact would result from Defendant Sanchez's action.

204. Defendant Sanchez's actions were committed with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton.

205. Defendant Shari Munoz intentionally and offensively touched Ms. Velez without her consent on both November 8, 2003 and November 11, 2003.

206. The contact was offensive in that a reasonable person would find it offensive to their personal dignity, even if no physical harm resulted.

207. Defendant Shari Munoz's actions were intentional in that Defendant Shari Munoz had personal knowledge to a substantial certainty that harmful or offensive contact would result from Defendant Shari Munoz's action.

208. Defendant Shari Munoz's actions were committed with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton.

209. Ms. Velez requests damages in an amount not less than $200,000.00.

### FIFTEENTH CLAIM FOR RELIEF
### Breach of Duty Under Law
### (All Defendants)

210. Ms. Velez realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

211. Under New York State Education Law § 3205 *et seq*. and New York State Labor Law § 143, Ms. Velez was required to attend school during the school year that began September 2001 when Ms. Velez was sixteen years of age, unless she withdrew from school and received specific certification allowing her to work full-time in lieu of attending school.

212. Under New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, Ms. Velez was prohibited from working, unless she first obtained an employment certificate or permit.

213. Under New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, Defendant Sanchez was prohibited from employing Ms. Velez without Ms. Velez first obtaining an employment certificate or permit.

214. Defendant Sanchez required Ms. Velez to work excess hours in violation of New York State Education Law § 3205 *et seq.* and New York State Labor Law § 143, which prohibit children aged sixteen and seventeen from working more than 8 hours per day, not to exceed 48 hours per week or 6 days per week or after 12 midnight or before 6 a.m. when school is not in session.

215. Defendant Sanchez prohibited Ms. Velez from enrolling in school and required instead that Ms. Velez work 17 hours per day caring for Defendant Sanchez's children and tending her home in violation of the aforementioned statutes.

216. Defendant Sanchez's conduct in prohibiting Ms. Velez from enrolling in and attending school was intentional and deliberate, and has the character of outrage frequently associated with criminal conduct.

217. Defendant Sanchez engaged in such conduct with a conscious and deliberate disregard of the interests of others such that her conduct may be called willful or wanton.

218. Defendants Yolanda Munoz and Shari Munoz assisted, conspired and acted in concert with Defendant Sanchez to prohibit Ms. Velez from enrolling in and attending school.

219. Ms. Velez was denied her legally entitled high school education and was damaged in an amount of not less than $500,000.

**WHEREFORE,** Plaintiff respectfully requests that judgment be granted as follows:

(a)   Money damages in the amount sought for each Claim for Relief;

(b)   Punitive and exemplary damages according to proof;

(c)   Attorney's fees and costs for Plaintiff against Defendant; and

(d)   Such other further relief as the Court may deem just and proper.

Plaintiff demands a trial by jury.

Dated: New York, New York
      July 1, 2005

> CITY UNIVERSITY SCHOOL OF LAW
> MAIN STREET LEGAL SERVICES
> INTERNATIONAL WOMEN'S HUMAN
> RIGHTS CLINIC
>
> By _____
>    Andrew Fields [AF 7795]
>    65-21 Main Street
>    Flushing, New York 13367
>    (718) 340-3400