UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
LINDA VELEZ,

               Plaintiff,

  -against-

BETSY SANCHEZ, YOLANDA MUNOZ, and
SHARI MUNOZ,

               Defendants.
----------------------------------------------------------x   **MEMORANDUM AND ORDER**
BETSY SANCHEZ,   Case No. 04-CV-4797 (FB) (CLP)

               Third-Party Plaintiff,

  -against-

HERNANDO SANCHEZ,

               Third-Party Defendant.
----------------------------------------------------------x

*Appearances:*
*For Plaintiff Linda Velez*:
ANDREW FIELDS, ESQ.
Guild for Human Rights Progress
220 36th Street. Suite 505
Brooklyn, New York 11232

*For Defendants Betsy Sanchez, Yolanda Munoz, & Shari Munoz*:
SHELDON G. KARASIK, ESQ.
Simon, Eisenberg & Baum LLP
24 Union Square East, Fifth Floor
New York, New York 10003

*For Third-Party Defendant Hernando Sanchez*:
HAL R. LIEBERMAN, ESQ.
Hinshaw & Culbertson, LLP
780 Third Avenue, 4th Floor
New York, New York 10017

**BLOCK, Senior District Judge:**

Linda Velez ("Velez") claims that she was trafficked from Ecuador and forced to work in the home of Betsy Sanchez ("Betsy"). That single assertion spawned two claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, a third under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, and another nine under state law.[1] All of those claims are asserted against Betsy; some are also asserted against Betsy's sister, Shari Munoz ("Shari"), and mother, Yolanda Munoz ("Yolanda").

In response, Betsy, Shari and Yolanda (collectively, the "Sanchez defendants") assert state-law counterclaims for unjust enrichment/restitution and assault.[2] In addition, Betsy filed a third-party complaint against her ex-husband, Hernando Sanchez ("Hernando"), seeking indemnity and contribution under state law in the event she is held liable to Velez.

The Sanchez defendants move for summary judgment on all of Velez's claims. In response, Velez cross-moves for summary judgment on her FLSA claim, several of her state-law claims, and all of the Sanchez defendants' counterclaims. Although Hernando has not moved for summary judgment on Betsy's third-party claims against him, they are obviously contingent upon Betsy's liability to Velez.

For the following reasons, the Court grants summary judgment to the Sanchez defendants on Velez's federal claims, and declines to exercise supplemental jurisdiction over the

---

[1]Four additional claims – for involuntary servitude in violation of the Thirteenth Amendment, breach of contract, "breach of duty" under New York's educational law, and negligent misrepresentation – were dismissed or voluntarily withdrawn.

[2]Additional counterclaims for conversion/theft, intentional/negligent misrepresentation, defamation, and intentional infliction of emotional distress were voluntarily withdrawn.

state law claims, counterclaims and third-party claims. The case is therefore dismissed in its entirety.

**BACKGROUND**[3]

**A. Velez's Relocation From Ecuador to the United States**

In 2001, Velez was living in her native Ecuador with her mother and stepfather (who is Betsy and Shari's biological father). She attended a private high school; the tuition was paid by her biological father.

In the summer of that year, Betsy spoke to her father and to Velez's parents about having Velez, who was then 16, come to New York to live with Betsy and Hernando. She promised that Velez would continue high school in the United States, and that she would pay Velez $80 per week in exchange for help taking care of the Sanchez's daughter, Nicole. Betsy later reiterated these promises directly to Velez, adding that she would provide "everything \that [Velez] would need," such as "food, [a] place to live, personal stuff." Velez Dep. at 12. She also promised to help Velez "go to college and also look for my papers to get legal here in the future." *Id*.

Velez agreed to move to the United States, arriving in New York in September 2001 on a six-month tourist visa. She lived in the Sanchez home until November 2003.

**B. Life in the Sanchez Home**

During Velez's first four to six months in the Sanchez household, Betsy was not working and remained at home. The amended complaint alleges that Velez was responsible for all of the household tasks as well as caring for the Sanchez children, Nicole and Erica, who was born in October 2002. Velez conceded, however, that Betsy performed at least some household tasks. Velez testified in particular about December 2001: "I would cook breakfast, I would sometimes

---

[3]To ensure that the facts are taken in the light most favorable to Velez, the Court relies principally on her deposition testimony. Because of the number of grammatical and/or transcription errors, quotes from the deposition are *verbatim*.

3

make lunch or I would cook dinner. Or maybe one day it could be [all three meals] or one day it could be just one, or the other day Betsy would do it when she was at home." Velez Dep. at 313. "[At] lunch, either [Betsy] would make something or I would make something. If she was busy I would do it or if I was doing something else with the baby she would do it. Or dinner time I would make something or she would make something." *Id.* Despite sharing responsibility over these activities, Velez perceived that her household responsibilities became comprehensive as time went on: "I felt like I was taking care of [the Sanchez children] 24 hours. Always looking for them, plus doing all of the household [work] in the house." *Id.* at 26.

Betsy returned to work approximately one month after Erica was born. Yolanda, the children's grandmother, then began to come to the house more often:

> [A]s soon as Betsy went back to work, Yolanda would come—I don't know if it was every day but most of the days of the week, and she would stay in the house . . . with me for some time, but I was doing everything else. She would take care of Nicole or Erica when I was doing [laundry] or cleaning or cooking[.]

*Id*. at 344. Yolanda's visits continued, with varying regularity, until at least September 2003. Velez claims that these visits were for Yolanda "to monitor" Velez on Betsy's behalf. Am. Compl. at ¶ 93.

Shari, Betsy's sister, was also a regular visitor. Velez believed her visits, like Yolanda's, were supervisory: "[Shari] would go sometimes to the house and she would see me doing stuff and taking care of the babies." Velez Dep. at 157. Although Shari "sometimes" directed Velez to perform household chores, her principal role was to tell Velez to "listen to [Betsy] and do what she tells you to do." *Id.* at 159.

During her time in the Sanchez home, Velez always had free room and board. She also had access to the family's television, telephone and computer, and had her own email account

4

for most of her time there. She communicated regularly with her parents, her stepfather and extended family, as well as friends she had made in the United States.

## C. Life Outside the Sanchez Home

Betsy did not honor her promise to send Velez to high school while in the United States. However, she did pay for Velez to take an English class, a GED course, and at least one class at Queensborough Community College. Velez traveled to these classes unescorted. She also visited the public library, sometimes with Yolanda and the children, but also alone.

In 2002, Betsy took Velez to the New York Department of Motor Vehicles in an effort to get some form of in-state identification; however, Velez was unable to do so because her tourist visa had expired. She eventually obtained a New York State tax identification number. Velez also went alone to the Ecuadoran Consulate on two separate occasions.

Velez apparently had at least some time off from her duties in the Sanchez household. Before Erica was born, she earned $60 to $80 per week at a job outside the home. Although she eventually quit the job to help Betsy with the new baby, the money she had earned was hers to do with as she pleased. She had a membership at the YMCA (a gift from Betsy), where she exercised frequently for "a few months." Velez Dep. at 137. She attended a one-month preparatory course for her religious confirmation. She spent a weekend in the Poconos with her stepfather's sister.

## D. Velez's Relationship with Betsy and Her Family

Velez's relationship with Betsy took an early blow because Betsy did not pay Velez her promised weekly wage. When, in October 2001, Velez asked why, Betsy said "she couldn't . . . because she wasn't working. And as soon as she started working she will give me what she promised me." Velez Dep. at 380. Betsy did not start paying, however. At some point in 2002, Hernando told Velez that he "wanted to give [Velez] some money," but that Betsy had said that it

5

was none of his business to get involved in the relationship between Betsy and [Velez]." *Id.* at 382-83.

Despite Velez's concern that she was shouldering the workload of the entire Sanchez household for no pay, her relationship with Betsy and her family remained cordial, even affectionate. She gave Betsy cards or letters on several occasions to commemorate holidays, including Valentine's Day, Mother's Day and Christmas. Velez testified that she regarded Betsy as her sister. The feeling appears to have been mutual: Betsy took Velez to a Broadway show and, later, on a family vacation to Florida. Although Velez was expected to take care of Nicole on the latter trip, she had free time to go swimming and shopping.

Velez also befriended Betsy's sister, Shari. The two often made popcorn and watched movies at Shari's apartment. Shari also took Velez to a show at Madison Square Garden, and to Atlantic City.

At some point, however, these relationships soured. In August or September of 2002, Betsy, Yolanda and Shari lectured Velez at length:

> [They told me that] I was being disobedient, that I was being ungrateful . . . . I had to listen to them. I had to do whatever they told me to do.

\* \* \*

> [E]very time I would try to say something they tell me you can't say anything, you just can't. You have to do what we te[ll] you to do and that's it.

\* \* \*

> They would tell me that [they] will own me, they will demand me what to do. That things that they had done and they had given me a house, they had given me a place to stay, and that I had to be grateful for that. That I had [to] keep doing what I was doing. And if they wanted to make a decision of sending me back to my country or do

6

> whatever they wanted to do with me, they would do it. Because they
> were responsible for me[.]

*Id.* at 495-97.

The increasing hostility was evidently due to Velez's continued requests for her promised wages. According to Velez, Yolanda told her:

> [Betsy] did not need to give me any money because I had whatever
> I needed . . . [Betsy] was doing enough, giving me a place, and, you
> know, giving me food to eat. That she was like a sister, so why
> would I be asking a sister for money for taking care of the babies, and
> cleaning the house and doing all of the housework, because she was
> my sister and [] family.

*Id.* at 413. In a similar vein, Shari told Velez that she was ungrateful: "[W]hy would I need money if I have everything at Betsy's house . . . . [W]hy I was ungrateful, why I wasn't listening. And that I didn't need money for anything else . . . . And, you know, she was just nasty[.]" *Id.* at 388. Velez further testified that Shari told her that her (Shari's) enemies "better watch out because she can do something to them. She can hate people, and, you know, she is a manipulator, so nobody will do anything to her. If somebody would hurt her then that person would get hurt back. She would get that person back." *Id.* at 477. Velez nevertheless continued to visit Shari's home because she "never thought that [Shari] would do something to [her] like that." *Id.* at 479.

Although both Betsy and Shari "would yell at [Velez]," she did not take their outbursts as threats of physical violence. Thus, she never felt afraid that either Besty or Shari would hit her. *Id.* at 46-47.

Velez occasionally complained to others about her situation; her recollection of a complaint to Magdalena Olennik ("Olennik"), a friend from one of her classes, is typical:

> I was babysitting in Betsy's house and [] I was doing all of the
> household and [] I wasn't ge[tt]ing paid for i[t]. And that I didn't
> finish my high school and I didn't have my papers . . . . I felt scared

7

> to say stuff. I felt scared to do things. I was scared all of the time
> and concerned about everything.

*Id.* at 67. Velez later clarified, however, that she chose to remain for the sake of Betsy's daughters: "I loved them so much that the only -- the main reason I was holding up was because of them." *Id.* at 75. Velez never told anyone -- despite numerous opportunities to do so -- that she felt that she was not free to leave. Indeed, as discussed in the following section, that is precisely what she did.

**E. Velez Leaves the Sanchez Home**

On November 8, 2003, Velez arranged to spend the night at Olennik's house. Betsy gave Velez permission to go, but reneged; she and Shari came to collect Velez from Olennik's house. According to Velez, Betsy, Shari, or both, told her:

> I was ungrateful. I was a bitch, a bad person. That I dishonored them.
> I was a terrible person. That they could do with me whatever [they]
> want. We brought you here and we can send you back to your
> country any time we [want]. So Betsy was really hurtful and I started
> crying and hysterical because I don't know what was happening.
> Why were they talking to me like that and why there were saying all
> of those things to me that night.

Velez Dep. at 69-70. At oral argument, Velez's counsel represented that Shari "did touch and push Miss Velez into the car in order to extract her from that place . . . at the direction of [Betsy] Sanchez." Tr. of Mar. 19, 2010, at 23-24.

Three days later, Velez decided to leave. On November 11, 2003, as Velez was packing her things, Betsy "pulled [her] hard on the arm." Velez Dep. at 47; *see also* Tr. of Mar. 19, 2010, at 27 (Counsel: "[I]n the course of the events that ultimately led to Miss Velez leaving the apartment, Miss Velez was trying to gather her things and leave. Her things were ripped open . . . . [Velez] was at some point grabbed by [Betsy] Sanchez in the course of this."). Velez then left the house without further incident.

8

At her deposition, Velez offered her explanation of why she did not leave before November of 2003:

> [I had] no choice [but to stay]. I was just trusting Betsy's word and I was hoping what she would do.... I didn't have nowhere to go *besides going back to Ecuador*.... I was scared of what would happen to me if I would leave Betsy's house.... I felt love for [Betsy's daughters] and I want to help them.... I had no money and nowhere to go *besides going back to my country*.... I had to find a way to start my future *here*.

Velez Dep. at 93-101 (emphases added). In other words, Velez understood that she could leave the Sanchez household (as she eventually did), but did not do so out of love for Nicole and Erica, and because she did not want to return to Ecuador. *See also id.* at 133 ("I wanted to stay in the United States but not any more with Betsy."). When asked directly, "Did you ever between September 2001 and November 2003 consider yourself a prisoner in the Sanchez home?" Velez replied, "On the last month that I was there was just hell, and after what happened on November 8th I knew it was over and I had to leave." *Id.* at 133. Thus, according to her own testimony, Velez felt compelled to stay for, at most, the last month of her time in the Sanchez household; once she made up her mind to leave, she was able to do so.

**F. Oral Argument**

As noted, the Court held oral argument on March 19, 2010. Velez's counsel conceded that the November 8th and November 11th incidents were the only two occasions when any of the defendants made unwanted physical contact with his client. As for threats of force, he conceded that they were based wholly on Velez's deposition testimony that Betsy and/or Shari told her she had to listen to their directions because they "owned" her; there was, according to counsel a "threat implicit in that." Tr. of Mar. 29, 2010, at 22, 28-29.

**DISCUSSION**

9

Though long, the litany of competing claims fits into three categories: (A) two claims brought under the ATS, (B) a single claim brought under the FLSA, and (C) a hodgepodge of claims, counterclaims and third-party claims brought under state law. The Court addresses each category in turn.

## A. Claims Under the ATS

Velez alleges that Betsy's proposition to bring her to the United States amounted to human trafficking. She further alleges that Betsy subjected her to forced labor, and that Shari and Yolanda assisted her in that endeavor.

### *1. Jurisdiction*

As the jurisdictional basis for her claims of human trafficking and forced labor, Velez invokes the ATS. Although the defendants have not challenged this basis, the Court has an independent obligation to assure itself, *sua sponte*, of its own jurisdiction. *See Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006).

The ATS grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. As the Second Circuit recently reiterated, the ATS is a "jurisdictional provision unlike any other in American law and of a kind apparently unknown to any other legal system in the world." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 115 (2d Cir. 2010). It is also -- in Judge Friendly's words – "a kind of legal Lohengrin," in that "no one seems to know whence it came." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975).

Judge Friendly's metaphor notwithstanding, the ATS's origins are not quite so obscure as those of Princess Elsa's champion.[4] One of Congress's very first enactments in 1789, the statute was initially intended to confer jurisdiction over "the modest number of international law violations with a potential for personal liability at the time," namely, "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). It took on an expanded role in 1980, however, when the Second Circuit held that the statute provided jurisdiction over a claim of "deliberate torture perpetrated under color of official authority." *Filartiga v. Pena-Irala*, 630 F.2d 876, 878 (2d Cir.1980). As the circuit court recently reiterated, *Filartiga* has come to stand for the proposition that

> the ATS provides jurisdiction over (1) tort actions, (2) brought by aliens (only), (3) for violations of the law of nations . . . including, as a general matter, war crimes and crimes against humanity -- crimes in which the perpetrator can be called "*hostis humani generis*, an enemy of all mankind."

*Kiobel*, 621 F.3d at 116 (quoting *Filartiga*, 630 F.3d at 890).

The Supreme Court endorsed *Filartiga*'s view of the ATS's role in *Sosa. See* 542 U.S. at 731 ("The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena-Irala*[.]"). It concluded that the statute could provide jurisdiction over any tort claim by an alien that "rest[ed] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." 542 U.S. at 725. Recognizing, however, that the creation of a private cause of action is a matter "better left to legislative judgment in the great majority of cases," *id.* at 727, the high court noted (1) that opening the door to additional

---

[4]The assembled German tribes knew only what they saw upon Lohengrin's arrival: "Ein Schwan zieht einen Nachen dort heran! / Ein Ritter drin hoch aufgerichtet steht!" Richard Wagner, Lohengrin act 1, sc. 2 ("A swan is pulling a barque towards us! A knight is standing upright in it!").

11

international norms would require "vigilant doorkeeping," *id*. at 729, and (2) that Congress could restrict the actions cognizable under the ATS "explicitly, or implicitly by treaties or statutes that occupy the field." *Id.* at 731.

The Court has no doubt that human trafficking and forced labor violate specific norms accepted by the civilized world. *Accord Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674 (S.D. Tex. 2009); *Licea v. Curaçao Drydock Co.*, 584 F. Supp. 2d 1355 (S.D. Fla. 2008). Two other considerations, however, lead the Court to conclude that the ATS does not confer jurisdiction over Velez's claims.

First, the expanded role for the ATS has always been understood as covering torts committed abroad. *See, e.g.*, *Sosa*, 542 U.S. at 715 (defining law of nations as, *inter alia*, "a body of judge-made law regulating the conduct of individuals situated outside domestic boundaries and consequently carrying an international savor"); *Kiobel*, 621 F.3d at 116 (noting that ATS litigation poses unique problems, in part because "the events took place abroad and in troubled or chaotic circumstances"). As a result, the Court has not found a single post-*Filartiga* case addressing claims arising out of domestic conduct; all of the conduct of which Velez complains occurred in the United States. Although no case holds that the ATS covers only torts occurring abroad, the Court is confident, as a matter of first impression, that Velez's claims of domestic human trafficking and forced labor are not within *Filartiga*'s conception of the statute's grant of jurisdiction.[5]

---

[5]The 18th-century conception of the statute contemplated that some actionable violations of the law of nations would occur on United States soil. Indeed, one of the motivations for the ATS may have been an incident "in which a French adventurer, De Longchamps, verbally and physically assaulted the Secretary of the French Leg[at]ion in Philadelphia." *Sosa*, 542 U.S. at 716. This original concern with torts against diplomats further reinforces the conclusion that the ATS is limited to torts with "an international savor." *Id.* at 715. Here, Velez's status as a foreign national is pure happenstance; she could just as easily have been sent from Idaho as from Ecuador.

Second, even if, *arguendo*, the ATS had conferred jurisdiction over such claims, that jurisdiction has now been implicitly withdrawn. In 2003, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. 108-193, 118 Stat. 2875, which, among other things, created a private right of action for any "individual who is a victim of a violation" of the federal criminal laws prohibiting human trafficking and forced labor. *Id*. § 4(a)(4), 117 Stat. at 2878 (codified at 18 U.S.C. § 1595).[6] The act took effect on December 19, 2003, *see* 18 U.S.C. § 1595 note, almost a year before Velez commenced this action.

Section 1595 creates claims identical to Velez's ATS claims. From that, the Court concludes – again, as an apparent matter of first impression – that Congress has, as the Supreme Court contemplated it might in *Sosa*, limited ATS jurisdiction by enacting a statute that occupies the field of civil remedies for human trafficking and forced labor.[7]

---

[6]When used as the predicate for a civil remedy, "the term 'violation' does not imply a criminal conviction . . . . It refers only to a failure to adhere to legal requirements." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 489 (1985) (addressing civil remedy for criminal RICO violations).

[7]In 1992, Congress enacted the Torture Victim Protection Act ("TVPA"), Pub. L. 102-256, 106 Stat. 73, which created a private right of action for victims of torture carried out "under actual or apparent authority, or color of law, of any foreign nation." *Id.* § 2(a). The Second Circuit has held that the TVPA left the scope of the ATS "undiminished" because it did not provide a remedy for non-state-sanctioned torture. *See Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995). Although § 1595 contains no analogous limitation, one could argue for a similar dichotomy between domestic human trafficking and forced labor (actionable under § 1595), and human trafficking and forced labor perpetrated abroad (actionable under the ATS).

It is, however, unclear whether § 1595 provides a remedy *only* for domestic violations of the criminal laws against human trafficking and forced labor. In *Roe I v. Bridgestone*, 492 F. Supp. 2d 988 (S.D. Ind. 2007), the Southern District of Indiana concluded that the statute did not apply to forced labor "that occur[s] outside the United States." *Id.* at 999. Shortly thereafter, however, Congress conferred jurisdiction over human trafficking and forced labor prosecutions based on events occurring abroad, as long as the defendant is a citizen, a permanent resident, or present in the United States. *See* 18 U.S.C. § 1596. Since § 1595 provides a civil remedy for victims of violations of the criminal prohibitions on human trafficking and forced labor, it would now appear to cover claims arising both in the United States and abroad. *See Adhikari*, 697 F. Supp. 2d at 683 (so holding).

Thus, the Court must either dismiss the human trafficking and forced labor claims for lack of jurisdiction under the ATS, or treat them as claims under § 1595. Although Velez did not invoke § 1595 as an alterative basis for her claims, her failure to do so is not dispositive because the underlying facts alleged and developed in discovery remain the same. *Cf. Harary v. Blumenthal*, 555 F.2d 1113, 1115 n.1 (2d Cir. 1977) ("When the complaint pleads facts from which federal jurisdiction may be inferred, . . . the insufficiency of the jurisdictional allegation is not controlling[.]"). In addition, the Court perceives no possible prejudice to the parties: Velez cannot be prejudiced because the alternative is to have her claims dismissed for lack of jurisdiction; defendants cannot be prejudiced (1) because the factual premises, as noted, remain the same, and (2) because, as discussed below, Velez cannot make out a § 1595 claim on the merits. For those reasons, the Court deems Velez's ATS claims to be claims under § 1595.

## 2. Merits

For purposes of § 1595, "forced labor" is labor obtained through one of four means: (1) force or the threat of force; (2) serious harm or threat of serious harm; (3) abuse or threatened abuse of law or the legal process; and (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]" 18 U.S.C. § 1589. Since "human trafficking" is defined as "knowingly recruit[ing] . . . any person" for forced labor, *see id.* § 1590, it, too, requires the same showing of means.

---

Because Velez's claims arose in the United States, the Court need not provide a definitive answer to that question. It notes, however, that if § 1595 provides a civil remedy for both foreign and domestic violations, then the ATS has no further role to play as the jurisdictional hook for human trafficking and forced labor claims answer that question. The ATS would, of course, continue to provide jurisdiction over claims by aliens for any other "violation of the law of nations or . . . treaty of the United States." 28 U.S.C. § 1350.

Velez's deposition testimony, and her counsel's concessions at oral argument, conclusively rule out a claim predicated on actual force, harm, or physical restraint. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (party may not contradict deposition testimony); *United States Trust Co. v. Shapiro*, 835 F.2d 1007 (2d Cir. 1987) (party bound by concessions of counsel). She was never subjected to force of any kind until November 8, 2003. According to her counsel, that force was limited to Shari "pushing" Velez into a car at Betsy's direction. Tr. of Mar. 19, 2010, at 24. The only other incident involving force occurred on November 11, 2003, when Betsy "pulled" Velez "hard on the arm." Velez Dep. at 47. No reasonable jury could conclude these two minor incidents -- neither of which resulted in physical injury -- caused Velez to believe that she had not been free to leave the Sanchez home during the preceding two years, particularly inasmuch as both incidents occurred in the waning days of her stay there.

Nor could a reasonable jury conclude on this record that Velez faced a threat of force or serious harm if she attempted to leave. Velez may have feared that Betsy would yell at her, but verbal abuse is not actionable under § 1595 unless it carries with it a threat of force or serious harm. By her own admission, Velez never feared physical harm from either Betsy or Shari because neither threatened her with such harm.

Finally, with respect to actual or threatened abuse of legal process, Velez cites threats to return her to Ecuador. While using the threat of removal proceedings to obtain some sway over an illegal immigrant might constitute such an abuse, Velez's own testimony demonstrates that she did not feel forced to work because of it; on the contrary, she made a voluntary choice to stay to make a life for herself in the United States. Velez also refers to events occurring after she left the Sanchez home; however, defendants' actions could not have compelled Velez to stay if, in fact, she

had already left. In sum, Betsy is entitled to summary judgment on Velez's claims for human trafficking and forced labor. Since Velez claims only that Shari and Yolanda assisted Betsy, they, too, are entitled to summary judgment; if Besty did not subject Velez to forced labor, Shari and Yolanda could not have helped her do so.

**B. Claim Under Fair Labor Standards Act**

The Fair Labor Standards Act ("FLSA") entitles employees, including "employees in domestic service," to a minimum wage. 29 U.S.C. § 206(f). Velez claims that she was a domestic servant employed by Betsy; she does not allege that either Shari or Yolanda was also her employer.

The FLSA defines the employer-employee relationship "as a matter of economic reality." *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003) (citation omitted). Relevant factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999) (citations omitted). No single factor is dispositive; "[i]nstead, the economic reality test encompasses the totality of circumstances, no one of which is exclusive." *Id.* (citation and internal marks omitted). One factor worthy of consideration here is that Velez bore a familial relationship to her alleged employer.[8]

---

[8]Betsy argues that her familial relationship with Velez bars FLSA liability as a matter of law. It is true that the FLSA contains a so-called mom-and-pop exception, *see* 29 U.S.C. § 203(s)(2); however, that exception applies only to an "[e]nterprise engaged in commerce or in the production of goods for commerce." *See id.* Velez claims, not that Betsy operated an enterprise, but that she employed a domestic servant. Of course, even though the exception does not apply, Velez must still demonstrate, under the "economic reality" test discussed in the text, that she was an employee and not, as Betsy claims, "a child [suing] her parents for wages on account of housework." Def. Br. at 28-29.

16

Velez's deposition testimony establishes that she was a member of the Sanchez household —albeit an unhappy one -- not an employee. She testified that she regarded Betsy as her sister, not her employer. Her mother was married to Betsy and Shari's father. While Betsy and Velez were not legal sisters, stepsisters, or sisters-in-law, the Court cannot ignore this close familial relation. Moreover, it was a relation that was important to Velez, as reflected by the cards and letters she gave to Betsy to commemorate important events like Mother's Day.

In addition, for at least some of the time in which Velez claims she was Betsy's employee, Velez concedes that Betsy was performing many of the household responsibilities. Betsy also provided Velez with gifts and paid for several endeavors outside the home, such as Velez's educational classes and her YMCA membership. These are not the sorts of dispensations one receives from an employer.

Perhaps most significantly, Velez chose to remain in the house after Betsy repeatedly told her that she was unable to pay her any wages. Velez also chose to continue babysitting the young Sanchez children, at least in part out of love for them. When her relationship with Betsy became strained, Velez did not react as an employee would—by quitting—but chose to remain because she simply wished to remain in the United States. In sum, while Velez was increasingly unhappy about the state of her relationship with Betsy, no reasonable jury could conclude that the "economic reality" of their relationship was that of employer and employee. Accordingly, Betsy is entitled to summary judgment on Velez's FLSA claim.

**C. Claims and Counterclaims Under State Law**

All that remains are the various supplemental state-law claims – Velez's claims, the Sanchez defendants' counterclaims, and Betsy's third-party claims against Hernando.[9] The Court's jurisdiction over these claims is based on 28 U.S.C. § 1367, which, however, allows a district court to "decline to exercise supplemental jurisdiction" if, among other circumstances, it has "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(4). The Second Circuit has set forth several factors to be considered when deciding whether to exercise supplemental jurisdiction: "(1) whether state law claims 'implicate[] the doctrine of preemption,' . . . (2) 'judicial economy, convenience, fairness, and comity,' . . . (3) the existence of 'novel or unresolved questions of state law,' . . . (4) whether state law claims 'concern the state's interest in the administration of its government.'" *Drake v. Lab. Corp. of Am. Holdings*, 323 F. Supp. 2d 449, 452 (E.D.N.Y. 2004) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Travelers Ins. Co. v. Keeling*, 996 F.2d 1485, 1490 (2d Cir. 1993).

Here, there are no special considerations to warrant a departure from the usual rule. Accordingly, the Court declines to exercise supplemental jurisdiction over any of the state-law claims, counterclaims and third-party claims.

## CONCLUSION

---

[9]Velez asserts three claims under New York's wage laws, as well as New York common-law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, fraudulent inducement, unjust enrichment, assault, and battery. As noted, the Sanchez defendants' remaining counterclaims are for unjust enrichment/restitution and assault, while Betsy's third-party claims are for indemnity and contribution.

With respect to Velez's federal claims, the Sanchez defendants' motion for summary judgment is granted and, *a fortiori*, Velez's motion for partial summary judgment is denied. Accordingly, those claims are dismissed with prejudice.

With respect to Velez's state-law claims, the Sanchez defendants' counterclaims, and Betsy's third-party claims, the Court declines to exercise supplemental jurisdiction. Accordingly, those claims are dismissed without prejudice to refiling in state court.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 30, 2010